2011 VT 128

**Raymond E. KNUTSEN v. Karen CEGALIS**

[35 A.3d 1059]

No. 10-351

---

¶ 1. November 15, 2011. Mother appeals from the family court's order awarding primary custody of the parties' five-year-old son to father. She complains that the family court made numerous errors in its decision, that the evidence fairly considered could lead only to the conclusion that she should have primary custody, and that the court was not impartial. We affirm.

¶ 2. Mother and father have one child together, born in 2005. After the parents separated, they could not agree on custody and a first trial was held in 2008. In that case, the family court awarded mother primary custody until March 1, 2010, at which time primary custody was to automatically transfer to father. On appeal in 2009, this Court confirmed that the family court's decision specifically "turned on father's demonstrated superior ability to promote frequent and continuing contact between the child and the other parent and his superior disposition to meet the child's future developmental needs," and that "these factors outweighed the mother's status as the child's primary caregiver." *Knutsen v. Cegalis*, 2009 VT 110, ¶ 5, 187 Vt. 99, 989 A.2d 1010 (citation omitted). Nevertheless, we reversed the prospective and automatic custody switch as impermissibly removed from real-time determinations of the child's best interests. *Id.* ¶¶ 5, 10. The case was remanded for further proceedings, although the custody and visitation terms of the order were continued pending the new hearing. *Id.* ¶ 17. Since then the child lived primarily with mother until March 2010, and then alternately with each parent every other week.

¶ 3. In August 2010, after rehearing, and anticipating the child's need for a primary residence for purposes of attending kindergarten, the family court again awarded primary custody to father. In reaching its decision, the court recited and analyzed the relevant parent-child relationship and environmental factors set forth at 15 V.S.A. § 665(b) for determining a custody order. The statute directs that the factors be weighed in arriving at a custody order in the "best interests of the child."

¶ 4. The court found that several factors supported awarding custody to either parent. The court found son to be well adjusted and that both parents were affectionate and dedicated to the child. *Id.* § 665(b)(1). According to the court, parents were both capable and willing to meet their child's developmental needs, except in regards to mother's sleeping arrangements discussed below. *Id.* § 665(b)(3). Relevant to § 665(b)(4), the court found that the environment at both father's and mother's homes was generally positive, with each providing the child with a variety of good activities and an opportunity to attend kindergarten. The court noted that the child's current attachment to both parents, their homes and communities, as well as his time with mother and father, was equal. At both locations there were other family members around to see him regularly. The court also noted that abuse was not an issue. *Id.* § 665(b)(9).

¶ 5. Resolving none of the remaining factors in mother's favor, the court did, however, conclude several in favor of father. As to the "quality of the child's relationship with the primary care provider," *id.* § 665(b)(6), the court reaffirmed its previous findings and conclusions that father's superior ability to foster the child's relationship with the other parent, and superior disposition to meet the child's developmental needs, outweighed mother's earlier position as primary caretaker.[1] Additionally, and in

---

[1] This particular determination was not questioned in mother's first appeal, which challenged: (1) the legality of a prospective custody order not grounded in the child's current best interests; (2) the order's claimed compliance with res judi-

some detail, the court revisited and compared the parents' respective conduct and attitudes towards the other's relationship with the child and their own capacities to serve the child's best interests. Overall, the court concluded that father was better suited to meet certain of the child's developmental needs, was better able to achieve transition of custody and could be relied upon to foster a positive relationship with the other parent, while mother was deficient in these areas.

¶ 6. First, relevant to "the ability and disposition of each parent to meet the child's present and future developmental needs," id. § 665(b)(3), the court found that a significant difference between the parents was mother having the child sleep with her. Mother acknowledged that her continued sleeping with the child was problematic, though she blamed the practice on earlier heating and air conditioning issues at her residence. Sleeping with mother, the court found, led to confusion in the child when father introduced him to the concept of having privacy in his own room at father's house. In turn, the child's understanding of notions like privacy, and the courtesy of knocking, was delayed by mother's sleeping custom. Thus, the court concluded father had "the superior disposition to address [son's] developmental need for sleeping in his own room and assertion of privacy in that room."

¶ 7. The major factor in the court's custody award, however, was its joint analysis of "the potential effect of any

cata principles; (3) the order's claimed circumvention of jurisdictional requirements; (4) whether the order contradicted the parties' agreement that mother would retain custody until child reached age six; (5) the court's interpretation of 15 V.S.A. § 665(b)(3) and (b)(5); and (6) the ability of father to challenge "that part of the award granting mother custody from the date of the final order until the start of kindergarten." *Knutsen*, 2009 VT 110, ¶ 6.

change" in the child's present housing arising from the impending award of primary custody to one of the parents, *id.* § 665(b)(4), and the "ability and disposition of each parent to foster a positive relationship and frequent and continuing contact with the other parent." *Id.* § 665(b)(5). The court concluded that the ability to foster a smooth transition in residence would be highly dependent on which parent was more capable of promoting the child's relationship and contact with the other. The court found that father was better able to achieve this than mother.

¶ 8. The court relied on a number of factual findings in determining the comparative ability and dispositions of the parents. For instance, mother continued in her practice of recording all of her interactions with father since 2006 in order to avoid false accusations by father, although the court found no evidence of any such false claims. The court noted that mother had no appreciation of the chilling effect of her recording on the interaction between the parents when transferring the child from one to the other. The court referred to psychological evaluations admitted in the first trial as explaining mother's persistence in her recording behavior as the product of overdefensiveness. Given mother's stated commitment to continue recording until she no longer feared father's dishonesty, the court noted that nothing in the intervening years suggested mother had become any less defensive.

¶ 9. The court found troubling, as well, mother's behavior during exchanges of the child from one parent to the other. The court noted transition incidents, like mother proposing therapy after the child asked about staying an extra day with father, and a time when father's arrival a few minutes early prompted mother to complain about encroachment and then retreat with the child into a restroom, as

illustrative of mother's negative attitude towards father. In other examples, the court found that mother twice ignored, until the last minute, the court's order that father be able to spend Father's Day with son, failing to comprehend the importance of the day. More generally, mother admitted to often forgetting son's backpack when dropping him off with father, an inattention the court found further reflective of her inferior ability to convey son to father in a positive manner. Essentially, the court concluded that the negatives of mother's misplaced emphasis on some issues, and her blind spots as to others, outweighed any benefit she might have hoped to achieve in proposing therapy. In all, the court determined it was mother, and not the child, who needed help at transition.

¶ 10. The court found other reasons to infer that mother would not foster a positive relationship with father. Mother believed, unreasonably in the court's view, that she was entitled to extra summer vacation time with son, when the court's order could be logically read to split vacation time equally. Mother also refused to communicate with father's fiancée, despite the fiancée's receptiveness. The court weighed mother's anti-father attitude "very heavily," while finding from evidence in both trials that father wanted a normal coparenting relationship with mother.

¶ 11. Mother appeals, arguing the court's conclusions are not supported by the evidence and that she, instead, should have primary custody. Pro se, mother asserted a myriad of challenges to the court's conclusions and findings of fact. Represented by counsel at oral argument, however, she waived any contest with the court's findings and focused her dispute on the court's conclusions.[2] Mother con-

tends the court erred in concluding father provided a superior diet, and proffers that her sleeping with the child is beneficial. She asserts that both parents' communities are not equally positive for their son, because father lives away from neighbors. Mother reiterates that father's lying justified her recording habit. Mother points to possible inconsistencies to discredit father's testimony. Mother posits that the court could not have considered all of the earlier psychological evidence. Mother contends that not bringing the son's backpack at transitions was irrelevant, that the court placed too much weight on her failure to remember Father's Day, and that there was no basis for concluding she engaged in any "less than positive conduct" towards father. Mother argues that the court failed to recognize the destabilizing influence of father's serial romances. Available to care for son after school, mother argues that custody should be with her, rather than leaving the child in the care of father's fiancée during his work hours.

¶ 12. Mother also complains of unfairness from the court. Mother points out that the court criticized as disingenuous her suggestion, denied by mother, that she homeschooled the child, while what she describes as father's effort to pass off

---

[2] Nevertheless, we note the court did err in referring to an instance where mother purportedly proposed a blended family overnight outing to a ski resort, deemed insincere by the court because father lived nearby, when the evidence confirmed that mother's overnight proposal was meant for ski areas farther away. Furthermore, mother's complaint in her pro se brief that the court improperly digressed in reporting on her supposedly deteriorating demeanor at trial is legitimate insofar as the court's description of mother's behavior appears irrelevant to its § 665 analysis or to its reaching any particular conclusion. Neither point, however, is dispositive to her appeal given that the balance of the court's conclusions are supported by the evidence.

adult printing as the child's during father's care drew no critical comment. Mother faults the court's adverse inferences about her recording behavior as unfair since her recordings were not admitted into evidence. Mother alleges general bias by the court as reflected in its description of her demeanor, compared to its lack of reaction to father's unilateral decision to transfer the child's medical files without mother's knowledge.

¶ 13. Conceivably, any one, or all, of the court's conclusions might have been decided differently, but "[t]he family court has broad discretion in awarding custody, and its findings will not be overturned unless clearly erroneous. Given its unique position to assess the credibility of witnesses and weigh the evidence, we will not set aside the [family] court's findings if supported by the evidence, nor its conclusions if supported by the findings." *Payrits v. Payrits*, 171 Vt. 50, 52-53, 757 A.2d 469, 472 (2000) (quotations omitted). If supported by any credible evidence, the trial court's findings will not be disturbed, *id.* at 54, 757 A.2d at 472, and the credibility assigned to witnesses and the weight accorded the evidence are left to the trial court's discretion. See *Mullin v. Phelps*, 162 Vt. 250, 261, 647 A.2d 714, 720 (1994) (noting that, on appeal, this Court does not reweigh evidence or re-evaluate credibility de novo). That a different weight or conclusion could be drawn from the same evidence may be grist for disagreement, but does not show an abuse of discretion. See *Payrits*, 171 Vt. at 54, 757 A.2d at 472-73. Nor will we reappraise the sincerity, motivations and consistency of witnesses, since such credibility determinations are "solely the province of the fact finder" and are not reconsidered here anew. *Omega Optical Inc. v. Chroma Tech. Corp.*, 174 Vt. 10, 20-21, 800 A.2d 1064, 1071 (2002). Thus, while mother would rely on different evidence, interpret the evidence differently, or offer new evidence for the first time on appeal,

these are not grounds for reversal.[3] See *Mullin*, 162 Vt. at 261, 647 A.2d at 720 (explaining that father's reliance on substantial portions of the record to illustrate evidence detracting from the court's findings simply demonstrated "the existence of conflicting evidence," but did "not satisfy the father's burden of showing the absence of credible evidence" for the court's decision).

¶ 14. Similarly, the family court has wide discretion in determining the best interests of the child. *Kasper v. Kasper*, 2007 VT 2, ¶ 5, 181 Vt. 562, 917 A.2d 463 (mem.); see also *Trahnstrom v. Trahnstrom*, 171 Vt. 507, 507, 756 A.2d 1242, 1244 (mem.) (while the court must weigh the factors presented in § 665(b), the statute "imposes no specific requirement on how this consideration is to be manifested in the court's findings and conclusions" (quotation omitted)). We will affirm its decision unless its use of discretion is clearly erroneous. *Kasper*, 2007 VT 2, ¶ 5. Accordingly, so long as the court's decision reflects reasoned, as opposed to arbitrary, judgment on the evidence presented, we will uphold its ruling. *Id.*

¶ 15. What was missing in the court's first custody order is present in the instant case — a weighing of the circumstances outlined in § 665(b) contemporaneously to the award of actual custody. The award is supported by the court's conclusions which, although disagreeable to mother, are supported by the findings and the evidence. It cannot be said on this record, as mother insists, that the court's determination of her "less than positive" conduct towards father was unsupported by evidence. Nor can it be said, given the findings of mother's ongoing antipathy toward father and her disinterest in the father-child relationship, while father was

---

[3] Because mother's printed case in its entirety does not alter our holding, father's motion to strike portions of appellant's printed case is denied as moot.

willing to promote the child's relationship with mother, that the court's weighing of the relevant statutory factors in father's favor was an abuse of discretion. Even if this was a close case, and even if inclined to reach a different result on the same facts, "[w]e have repeatedly stated . . . that our review of custody matters is limited, and that we must defer to the judgment of the trial court applying its own common sense and experience." *Porcaro v. Drop*, 175 Vt. 13, 18, 816 A.2d 1280, 1285 (2002).

¶ 16. Mother's complaints about unfairness are equally unavailing. The court's suspicion that mother was representing her time with the child as homeschooling was supported by mother's own exhibit entitled "Home School Notes" describing her activities as "language arts," "computer skills," "science," "mathematics," "reading," and other subjects. Her counter-example, that the court ignored an equivalent misrepresentation by father in a photograph purporting to depict lettering beyond the child's developmental capacity while under father's supervision, is unsupported by any reference to the record or the evidence, and is not preserved for appeal. See *Bergman v. Marker*, 2007 VT 139, ¶ 8, 183 Vt. 68, 944 A.2d 265 ("Failure to raise an issue in the family court precludes . . . raising it on appeal."). Nor was it inappropriate for the court, after excluding mother's recordings due to inaudibility, to consider the circumstances of her recording habit and its impediment to communication between the parents in front of the child. Admissibility of the recordings was unrelated to their relevance to mother's ability to foster a father-child relationship. The court's observation of mother's changed demeanor is curious since its significance was unexplained, but its accuracy is not disputed and it reflects no prejudice in and of itself. Mother's comparison to the court's nonreaction to father's transfer of the child's medical records from one pediatrician to another adds nothing to her contention of bias. The absence of evident malfeasance on father's part and mother's personal disagreement with father's testimony that he followed the advice of the records clerk presents no record upon which to conclude father created any risk worthy of comment from the court.

*Affirmed.*