NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 124

No. 2016-135

| | |
|---|---|
| Kerry Clark | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Washington Unit, |
| | Family Division |
| | |
| Kyle Bellavance | October Term, 2016 |

Kevin W. Griffin, J.

Barbara R. Blackman of Lynn, Lynn, Blackman & Manitsky, P.C., Burlington, for
  Plaintiff-Appellant.

Allison A. Ericson of Law Offices of Sedon & Ericson, P.C., Chelsea, for Defendant-Appellee.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1.    **EATON, J.**  Mother appeals from a family court order modifying parental rights and granting father sole legal and physical rights and responsibilities for their daughter. Mother argues that the family court's decision modifying parental rights was based on erroneous facts and improper consideration of the child's bests interests and resulted from bias against her by the court. We affirm.

¶ 2.    Mother and father are the parents of a daughter, who was born in 2009. Mother and father were never married and their relationship ended before daughter was born; daughter lived exclusively with mother for the first twenty-one months of her life. In April 2011, the parties entered into a parenting agreement, accepted by the court as an order, that gave mother sole legal and physical rights and responsibilities for daughter, subject to father's parent-child contact. The court found that when the parties entered into the original parenting agreement, they "were

committed to a healthy, respectful and supportive co-parenting relationship where the parties agreed to make good faith efforts to foster a positive relationship between [daughter] and each parent and to the extended family," and although mother and father had "markedly different views" of the stability of their co-parenting arrangement, neither party sought modification until 2015.

¶ 3. On January 26, 2015, mother called the Department for Children and Families (DCF) to report that daughter had allegedly disclosed that father sexually abused her. According to mother, daughter told her that father had hurt her and "touched her privates and butt a lot." Mother took daughter to the emergency room, where she was examined by physician Dr. Matthew Greenberg. Dr. Greenberg noted that "[daughter] appear[ed] pain free, eating and smiling," and although mother asked daughter to tell hospital personnel about the alleged abuse, daughter made no disclosures. Given the severity of the allegations, Dr. Greenberg recommended that mother take daughter to the University of Vermont Medical Center (UVMMC) for a pediatric sexual assault (SANE) evaluation, which she did. Daughter did not disclose any abuse and the results of the exam revealed "[n]o obvious signs of acute or chronic trauma." An evaluation with Dr. Karen Patno, a child sexual abuse specialist, was scheduled to take place on February 18, 2015. Mother did not tell father about the alleged disclosures or examinations until she met with him on January 28. Within a week, DCF opened an investigation based on mother's report, and an investigator conducted a forensic interview with daughter on February 3. DCF did not substantiate any abuse by father and the agency took no further action. On February 18, mother took daughter to Dr. Patno who, without consulting the doctors at UVMMC, the DCF investigators or father, conducted an "unremarkable" physical exam and an unrecorded interview with daughter; Dr. Patno told mother that during the interview daughter disclosed abuse.

¶ 4. In the meantime, mother had demanded that father voluntarily suspend his parent-child contact with daughter and when he refused, she unilaterally withheld father's parent-child contact on January 28, 2015, and filed an emergency motion to modify parent-child contact. The court did not immediately rule on the motion and ordered that the existing 2011 parenting order

2

remain in place. Nevertheless, over the course of the next ten days, mother filed for emergency ex parte relief on behalf of daughter and withheld father's parent-child again on February 4. In response, father retained counsel, filed for temporary emergency relief, and requested a forensic mental health evaluation. The court rejected father's request for emergency relief but warned mother that "Father's parent-child contact shall remain in place unless or until this court modifies the order in place." Despite the court orders, between January 25 and February 18, mother unilaterally withheld father's parent-child contact rights on four separate occasions, and on February 19, 2015, the court granted father's motion for temporary emergency relief, awarding father sole legal and physical rights for daughter and suspending mother's parent-child contact.

¶ 5.     On February 23, 2015, the court held a hearing and received testimony from Dr. Greenberg and Dr. Patno. The court found that Dr. Patno's testimony was not credible and found that "to date there was no credible evidence that Father had sexually abused [daughter]." After impressing upon mother the importance of obeying court orders, the court permitted limited supervised parent-child contact between mother and daughter and the parties agreed to submit to a family forensic evaluation with Dr. William Halikias that would involve detailed interviews with various members of mother's and father's families. On April 6, 2015, the court issued an amended order on a temporary basis regarding parental rights and responsibilities. Under the amended order, father retained sole legal and physical rights and responsibilities but mother was awarded unsupervised parent-child contact two days a week, plus every other weekend.

¶ 6.     On October 5 and 7, 2015, the court held evidentiary hearings and took testimony from the parties, experts, and fact witnesses. Based on that testimony and the testimony adduced at the February 23, 2015, hearing, the court made a sequence of findings that resulted in father permanently acquiring legal and physical rights for daughter. Those findings and the court's conclusion are the subject of this appeal.

¶ 7.     First, the court found that "Mother [had] embarked on a mission that would have destroyed Father's relationship with [daughter] had it succeeded," and that mother's behavior had

3

caused "a total breakdown in the parenting plan." The court specifically noted a portion of the Halikias report, which was admitted by stipulation of the parties: "Mother had difficulty organizing and deploying rational thoughts" and "Mother's fixated belief that Father has sexually abused [daughter] makes it unlikely that Mother can exercise sound judgment or perceptual skills while interacting with [daughter]." The court concluded that, although mother had "shown significant improvement," she nevertheless "still firmly believe[d] that Father molested [daughter]" and her "belief that [daughter] was molested by Father has not abated." The court further found that "Mother is accepting of the fact that 'charges aren't going anywhere' so 'she has to cope,' " but found mother's testimony about her daughter's alleged disclosure not credible. Additionally, the court found that "Mother is invested in the belief that [daughter] has been sexually abused and traumatized by Father, so she needs [daughter] to be ill to support her feelings and beliefs about Father." The court noted Dr. Halikias's concern "that [daughter] 'stands at extraordinary risk for future social and mental health problems, particularly depression and anxiety, or maladaptive personality traits.' " According to the court, "the most insightful but disturbing part of Mother's testimony was when she acknowledged that she now 'understands the game . . . and the dance,' " and "the court s[aw] little progress on Mother's part since the completion of the Halikias assessment in April 2015."

¶ 8. Second, the court found, based on the Halikias report, that father "supports fostering a positive relationship between [daughter] and mother." "Father has been responsive and cooperative" in coordinating daughter's counseling with daughter's therapist and with mother, although the court found that "[f]or Father, the most concerning aspect of his relationship with Mother is her failure to acknowledge or apologize for her conduct that brought about the change in custody status." Third, the court found that since father gained temporary custody of daughter, "she seems more relaxed and happy," "[s]he eats well and no longer fears the police," "[h]er level of anxiety has diminished," and she "is more confident and more open to meeting people." The court concluded that "[daughter] has lived primarily with Father for the past 14 months and her

4

transition to Father's home has gone surprisingly well. After an initial adjustment period where [daughter] missed seeing her Mother on a daily basis, she has relaxed and grown comfortable with Father as the primary caretaker." As a result, the court found that "[i]t would not be in [daughter]'s best interest to return her to Mother's primary care."

¶ 9. Based on those findings, the court concluded that there had been a real, substantial, and unanticipated change of circumstances since the original parenting order went into place in April 2011. Specifically, the court identified mother's ongoing belief that father is a pedophile who has molested daughter as contributing to a breakdown in the parenting plan and cited to the fact that mother violated court orders by unilaterally preventing father from exercising his parent-child contact rights. The court found that mother's behavior, changed belief system, and inability to co-parent with father constituted changed circumstances. The court then addressed, in order, the nine statutory best-interests factors outlined in 15 V.S.A. § 665 and found that of the eight factors that applied, all favored father. The court granted father's motion to modify parental rights and responsibilities and permanently transferred to father sole legal rights and responsibilities, subject to mother's parent-child contact rights. Mother appealed.

¶ 10. Mother now raises four arguments. She asserts the trial court (1) made erroneous factual findings on issues that were central to its changed-circumstances determination; (2) erred in its changed-circumstances determination because she alleges that there is insufficient evidence in the record, excluding the findings that she argues were erroneous, to support the court's conclusion; (3) misapplied the primary caregiver factor under 15 V.S.A. § 665(b); and (4) improperly considered testimony on the parties' pre-order relationship.

¶ 11. Our review of a previous child-custody determination begins with the controlling statute, 15 V.S.A. § 668(a), which creates a two-step analysis: "On motion of either parent . . . and upon a showing of real, substantial and unanticipated change of circumstances, the Court may annul, vary, or modify an order [regarding child custody] if it is in the best interests of the child." Thus, the moving parent bears the burden of making "a threshold showing of a 'real, substantial

5

and unanticipated change of circumstances.' " Habecker v. Giard, 2003 VT 18, ¶ 5, 175 Vt. 489, 820 A.2d 215 (mem.) (quoting 15 V.S.A. § 668(a). If the moving parent meets that burden, "the court may change custody only when the best interests of the child so require." Id. (citing 15 V.S.A. § 668). "The burden for such a showing remains on the moving party, and, due to the value of stability in a child's life, it is a heavy one." Id.

¶ 12. Additionally, "[i]n the highly fact-intensive context of a custody determination, we rely on the family court's determinations of fact and evaluations of credibility." Chickanosky v. Chickanosky, 2011 VT 110, ¶ 14, 190 Vt. 435, 35 A.3d 132. "That a different weight or conclusion could be drawn from the same evidence may be grist for disagreement, but does not show an abuse of discretion," and although one party "would rely on different evidence, interpret the evidence differently, or offer new evidence for the first time on appeal, these are not grounds for reversal." Knutsen v. Cegalis, 2011 VT 128, ¶ 13, 191 Vt. 546, 35 A.3d 1059 (mem.).

## I. Change of Circumstances

¶ 13. The family court has discretion in determining whether a substantial change in circumstances has occurred, and "we will not disturb the court's determination unless it exercised its discretion on grounds or for reasons clearly untenable, or if its exercised discretion to a clearly unreasonable extent." Maurer v. Maurer, 2005 VT 26, ¶ 8, 178 Vt. 489, 872 A.2d 326 (mem.). Our evaluation of the exercise of that discretion is premised on an understanding that "[t]he statute and our cases regarding change in custody reflect the policy that giving stability to a child's life, to the extent possible under the circumstances, is so important that custody ought not to be modified without critical justification." Kilduff v. Willey, 150 Vt. 552, 553-54, 554 A.2d 677, 678-79 (1988). "There are no 'fixed standards to determine what constitutes a substantial change in material circumstances,' " Maurer, 2005 VT 26, ¶ 7 (quoting Wells v. Wells, 150 Vt. 1, 4, 549 A.2d 1039, 1041-42 (1988)), but examples of relevant considerations include the parties' inability to share parental rights and responsibilities if that inability is a new development, id. ¶ 8, "a breakdown in communication between parents," id., efforts by one party to interfere with the

other's visitation rights, especially when those efforts violate court orders, Wells, 150 Vt. at 4-5, 549 A.2d at 1042-43, and evidence of one party's changed mental condition or ability to effectively parent, Habecker, 2003 VT 18, ¶ 9.

¶ 14. In this case, the family court concluded that there was a real, substantial, and unanticipated change of circumstances based on its finding that, as of October 2015, mother continued to believe that father molested daughter and mother's response to that belief—in terms of both how she treated daughter and how she interacted with father—caused a "complete breakdown" in the 2011 parenting plan. On appeal, mother challenges the court's factual findings and argues that the "court erred when it held that Mother continues to believe that Father sexually abused [daughter]." Specifically, mother identifies various factual findings that she argues were in error—perhaps because the court did not issue its decision until six months after the October 2015 hearing—and urges this Court to reverse because, she claims, the errors she alleges were central to the court's changed-circumstances finding. Additionally, mother argues that the court abused its discretion when it found a real, substantial, and unanticipated change in circumstances because, according to her, the court misinterpreted the record and impermissibly made factual findings about events that transpired before the original parentage order.

¶ 15. We have considered the specific factual errors alleged by mother and, if erroneous at all, they do not, either individually or in combination, rise to the level of reversible error. We address each alleged error in turn. Mother argues that the court erred when it found that mother had daughter examined by multiple professionals after initial examinations failed to confirm mother's belief that father abused daughter and mother disputes the court's finding that daughter did not disclose sexual abuse until she was interviewed by Dr. Patno. However, the record is clear that, as a result of mother's allegations, daughter was examined by multiple professionals. Moreover, mother's argument—that daughter disclosed to a professional in the emergency room— is an inaccurate interpretation of the record. Mother claims that the emergency room record notes, which were admitted into evidence, show that daughter "disclosed that her father had touched her

'on her bottom and privates.' " In fact, the note merely describes mother's own recitation of events to the treating physician. The trial court was not in error when it declined to recast mother's statements as having been made by the emergency room physician. Cf. Krupp v. Krupp, 126 Vt. 511, 514, 236 A.2d 653, 655 (1967) ("A recitation of evidence in findings is not a finding of the facts contained in the testimony related and it cannot be so construed."). Although mother urges this Court to accept her version of events, the only record evidence that supports her position is testimony from her and from Dr. Patno and the trial court found that neither witness was credible. "We reiterate that our role in reviewing findings of fact is not to reweigh evidence or to make findings of credibility de novo." Mullin v. Phelps, 162 Vt. 250, 261, 647 A.2d 714, 720 (1994).

¶ 16. Mother also argues that the court erred when it found that father, not mother, enrolled daughter in counseling, and when it found that father effectively communicated with daughter's therapist but made no finding about mother. Even if we assume that the trial court did err on these points, we nonetheless cannot discern a basis from which to disturb its decision because the alleged errors were collateral to the findings, discussed below, that formed the basis for the court's changed-circumstances determination. See Peckham v. Peckham, 149 Vt. 388, 390, 543 A.2d 267, 269 (1988). Specifically, the court found that a real, substantial, and unanticipated change of circumstances took place for three clearly articulated and well-supported reasons.

¶ 17. First, the court found that when the parties entered into the original parenting agreement in April 2011, they "were committed to a healthy, respectful and supportive co-parenting relationship where the parties agreed to make good faith efforts to foster a positive relationship between [daughter] and each parent and to the extended family." By the time of the evidentiary hearing, however, the court found that "Mother [had] embarked on a mission that would have destroyed Father's relationship with [daughter] had it succeeded." Specifically, the court found that mother's belief that father "is a pedophile who has molested [daughter] on multiple occasions despite the absence of any credible evidence to support the allegations" was a new development that caused "a total breakdown in the parenting plan." Cf. Maurer, 2005 VT 26,

8

¶ 8 (holding that breakdown in communication and inability to share parental rights and responsibilities established changed circumstances); Meyer v. Meyer, 173 Vt. 195, 197-98, 789 A.2d 921, 923 (2001) (holding that complete breakdown in communication established changed circumstances).

¶ 18.    Even if it is true, as mother argues, that when she originally raised her concerns about father concerning sexual abuse there was a sufficient basis for the court to treat her allegations as being made in good faith,[1] the court made two findings in particular that render the purported good faith of mother's initial allegations immaterial.  First, the court found the testimony presented by mother's expert, Dr. Patno, not credible and concluded that Dr. Patno's interview with daughter "violated the accepted norms and professional standards on sexual abuse interviews of children."  Second, based on testimony from Dr. Marilyn Turcotte, mother's therapist, the court found that "after 21 sessions with Dr. Turcotte, Mother still firmly believes that Father molested [daughter]" and that "Mother's belief that [daughter] was molested by Father has not abated, but Mother is accepting of the fact that 'charges aren't going anywhere' so 'she has to cope.' "[2]

---

[1] We agree with mother, of course, that if daughter did disclose sexual abuse, "[i]t was her responsibility, her duty and moral obligation as a Mother, to follow-up on her daughter's disclosure, seek medical guidance and intervention of the court."  We emphasize that our holding today in no way implies that parents who report abuse in good faith should be penalized by the court system for reporting it.

[2] Mother argues that "[t]here is no credible evidence to support the family court's essential findings concerning Dr. Marilyn Turcotte" and in particular, mother argues that the court "erred when it held that Dr. Turcotte believes that Mother continues to feel that Father abused [daughter]."  However, Dr. Turcotte testified as follows:

> THE COURT: Okay.  So during the course of your twenty sessions, has mother changed her view [that father sexually abused daughter]?
>
> DR. TURCOTTE: What I can say is that I think she realizes that the abuse charges aren't going anywhere and that it's unproductive to continue along that line and that she does want her daughter safe and protected.  She's willing to co-parent.
>
> THE COURT: But she still thinks something happened, the charges just aren't going anywhere?

Additionally, although mother testified at the October 7, 2015, hearing and had an opportunity to renounce her belief that father molested daughter, mother never expressly denied that she continued to believe that father molested daughter.[3]

¶ 19.    From that evidence, the court found that even if mother's initial allegations of sexual abuse were made in good faith, her beliefs had not changed despite her awareness of substantial evidence that father did not abuse daughter.  Mother's continued insistence that father abused daughter in light of significant credible evidence to the contrary—not her initial concerns regarding of abuse—is what formed the basis of the court's finding that there had been "a total breakdown in the parenting plan."  As the court noted, "[f]or Father, the most concerning aspect of his relationship with Mother is her failure to acknowledge or apologize for her conduct," and that failure on mother's part has contributed to a breakdown in the parties' ability to communicate and effectively co-parent.  The court did not abuse its discretion in concluding that the parties' inability to effectively communicate or follow the parenting plan amounted to changed circumstances.  See Maurer, 2005 VT 26, ¶ 8.

_____

> DR. TURCOTTE: I do believe she thinks something happened. Again going back to what she told me initially, until [daughter] disclosed that it was her father, she didn't know who had molested her.

The court interpreted Dr. Turcotte's testimony—"I do believe she thinks something happened"—to mean that "Mother's belief that [daughter] was molested by Father has not abated."  The weight and credibility of this testimony is a matter reserved for the trial court.  Chickanosky, 2011 VT 110, ¶ 14.  Although mother would direct this Court to consider different portions of Dr. Turcotte's testimony, the fact that mother urges us to "rely on different evidence [or] interpret evidence differently" is "not grounds for reversal."  See Knutsen, 2011 VT 128, ¶ 13.

[3]  Specifically, mother testified that she "did what [she] thought was right, but in that minute, it was the only right thing to do."  Although mother argues that her testimony shows that at the time of the October hearing she did not believe that father was presently sexually abusing daughter, this Court cannot identify any part of mother's testimony that expressly rejects the notion that mother continued to believe that father had abused daughter in the past.  If mother came to believe that daughter had not been abused or that father was not responsible for it, her testimony on these points was tenebrous at best.

¶ 20.    Second, the court found that mother's persistent belief that daughter had been abused caused mother to treat daughter as a victim and to subject daughter to "multiple invasive medical examinations and investigative interviews focused on whether Father abused [daughter]." Again, mother challenges the weight that the family court gave to the testimony of various experts about the impact on daughter of repeated forensic interviews and trips to the doctor to investigate sexual abuse.  Specifically, mother characterizes the court's finding as one only "based on the opinion of the court-appointed expert."  We interpret the decision below more broadly.  The court considered mother's allegations of sexual abuse and her persistent treatment of daughter as an abused child in light of its conclusion that the court-appointed expert—who testified that because of mother's behavior, daughter "stands at extraordinary risk for future social and mental health problems, particularly depression and anxiety, or maladaptive personality traits"—was credible and that his testimony was "sound, well reasoned and convincing."  The court's findings, then, were that mother's allegations and persistent beliefs undermined her ability to effectively co-parent with father and posed a real threat of harming daughter in a way that the parties had not envisioned when they entered into the parenting agreement in April 2011.  The court did not abuse its discretion in finding that mother's treatment of daughter as a sexual abuse victim threatened daughter's well-being and undermined the goals of the parenting plan, and that those factual determinations likewise demonstrated changed circumstances.  See Habecker, 2003 VT 18, ¶ 9.

¶ 21.    Third, the court found that "Mother unilaterally breached Father's parent-child contact rights despite repeated warnings from the court not to do so."  As mother acknowledges, she ignored court orders and prevented father from having scheduled parent-child contact with daughter on four occasions.  Mother's "willful and unilateral decisions to violate th[e] court's orders" resulted in the court granting father's request for emergency relief and suspending mother's parent-child contact in February 2015.  In addition, when father attempted to exercise his right to parent-child contact, mother interfered on at least two occasions.  The first instance occurred when father had a weekend visit with daughter in February 2015.  Mother gave daughter

a phone and made numerous calls to daughter over the course of the weekend, resulting in a court order that daughter "not have a cell phone while she is with Father." The second instance involved mother misleading father as to the location of a pre-scheduled psychiatric evaluation for daughter, and while mother now argues that her attorney unintentionally misinformed father of the location, the court below found that "Mother is simply not credible on this issue." Based on these incidents as well, the court concluded that mother's repeated interference in father's right to parent-child contact weighed in favor of a finding of changed circumstances. See Maurer, 2005 VT 26, ¶ 8; Wells, 150 Vt. at 4-5, 549 A.2d at 1042-43. Thus, the court's determination that a material change of circumstances had occurred was not dependent upon its findings about which party enrolled daughter in counseling or how the parties communicated with daughter's therapist, but was instead based on independent evidence amply supported in the record.

¶ 22.    Finally, mother's argument that the court was biased against her and that its decision was tainted by what she characterizes as "unflattering and prejudicial findings" about her relationship with father prior to the original parenting order is unavailing. First, mother argues that the court erred when it concluded that mother continues to believe that father's family has influence over the court. Mother produced nothing to support her initial allegation and produced no evidence to contradict the court's interpretation of record testimony that mother had at least initially believed that father's family had influence over the court. Second, there was an objection to testimony related to the parties' pre-order relationship, and the court ruled that it would admit the testimony because it "want[ed] some of that context" in order to "[evaluate] the alleged change of circumstances." Trial courts have broad discretion in making evidentiary rulings, and we will not revisit those rulings absent an abuse of discretion. Soutiere v. Soutiere, 163 Vt. 265, 269, 657 A.2d 206, 208 (1995). There was no abuse of discretion here. Mother has not offered any evidence that the court below relied on its brief discussion of events that transpired prior to the original parenting agreement, nor has she done anything more than to "apparently suggest[] that any testimony taken at the modification hearing about events preceding the original decree constitutes

per se reversible error." Hayes v. Hayes, 144 Vt. 332, 337, 476 A.2d 135, 139 (1984). As it indicated it would do, the court based its decision on evidence of events that transpired after the original parenting agreement; any brief recitation of testimony about events that transpired prior to the original parenting order did not affect its ultimate findings on changed circumstances. See Gokey v. Gokey, 127 Vt. 334, 335, 248 A.2d 738, 739 (1968) (reasoning that trial court's is limited to question of "whether a substantial change in circumstances and conditions have developed subsequent to the divorce decree"). The court's reasons for finding changed circumstances were clear, and we cannot conclude that the court "exercised its discretion on grounds or for reasons clearly untenable" or "exercised discretion to a clearly unreasonable extent." Maurer, 2005 VT 26, ¶ 8.

## II. Child's Best Interest

¶ 23. Section 665(b) provides the framework for the second step of a court's custody modification analysis—the best interests of the child—and instructs courts to consider nine statutory factors, as well as any other relevant evidence. See Osmanagic v. Osmanagic, 2005 VT 37, ¶ 6, 178 Vt. 538, 872 A.2d 897 (mem.). The family court "is entitled to draw upon its own common sense, experience in life, and the common experience of [human]kind," Kasper v. Kasper, 2007 VT 2, ¶ 6, 181 Vt. 562, 917 A.2d 463 (mem.) (quotation and alterations omitted), in determining what is in the child's best interests, and so long as the "court's award of custody reflects its reasoned judgment in light of the record evidence, its decision may not be disturbed. Id. ¶ 5. Here, the court considered each of the nine statutory factors and, looking to evidence in the record that the court found credible, concluded that father was the primary caregiver and that it was in daughter's best interests to remain in father's permanent custody. Mother appeals the court's best-interests analysis, claiming that the court was in error in its consideration of "the quality of the child's relationship with the primary care provider, if appropriate given the child's age and development." 15 V.S.A. § 665(b)(b).

¶ 24.    This Court has "not enunciated a definitive standard for determining the identity of the primary-care-provider under § 665(b)(6)," and mother is correct that the Court has expressly rejected an invitation to adopt "a per se rule that the parent with physical custody at the time of the divorce hearing is the primary-care-provider." Nickerson v. Nickerson, 158 Vt. 85, 89-91, 605 A.2d 1331, 1333-34 (1992).  Mother is also correct that the weight to be given to the primary-caregiver factor must be determined in light of the likely effect on the child, and that where one parent is the primary caretaker, "this factor should be entitled to great weight unless the primary custodian is unfit." Harris v. Harris, 149 Vt. 410, 418-19, 456 A.2d 208, 214 (1988).  Mother is incorrect, however, in her claim that the trial court in this case applied a per se rule.  Although the court was not especially clear in its discussion of the primary-caregiver factor, it did conclude that daughter "has relaxed and grown comfortable with Father as the primary caretaker," and there is sufficient evidence in the record to support the court's finding that this factor favors father.

¶ 25.    The court explicitly found that "[a]t this point [the primary-caretaker factor] favors Father."  Contrary to mother's assertion, the court did not make that determination solely because father had physical custody of daughter at the time of the modification hearing.  It would have been improper for the court to do so since this would result in the temporary order creating a primary caretaker hurdle that mother could not overcome.  However, the court went beyond the custodial relationship, finding that "[s]ince Father gained primary custody of [daughter], he has met her needs and has a close and loving relationship with her.  They are strongly bonded and Father continues to provide a safe and nurturing home that allows [daughter] to thrive."  The court also acknowledged that "[m]other had been [daughter's] primary caretaker since birth" but that the changed circumstances described above resulted in father obtaining primary custody.  The court therefore appropriately considered the roles that both parents had played during the crucial period "between the [initial parenting order] and the filing of the motion to modify" and thereafter, concluding that although mother was the primary caretaker until the temporary modification order, father became the primary caretaker in the period between the filing of the motion and the

modification hearing. In assessing the primary-caretaker factor, the court should consider all relevant periods in the child's life and while the period between the original parenting order and the filing of the motion to modify is most relevant, consideration of the child's relationship with both parents until the time of the hearing on the modification motion is also a period the court was free to consider. See deBeaumont v. Goodrich, 162 Vt. 91, 101, 644 A.2d 843, 849 (1994). It is evident here that the court did not determine that the primary-caretaker factor favored father solely because he had primary custody of the child at the time of the modification hearing. On the contrary, the court noted the bond that had developed between father and daughter, which need not necessarily result simply from having primary custody of the child for a period of time. While mother may disagree with the court's finding on this point, the finding that father is the primary caretaker "is supported by the evidence and is not clearly erroneous." Id.

¶ 26. To the extent that mother challenges the court's findings with respect to father's relationship with daughter, we emphasize again that so long as the "court's award of custody reflects its reasoned judgment in light of the record evidence, its decision may not be disturbed." Kasper, 2007 VT 2, ¶ 5. Specifically, the court credited the testimony of witnesses on the following points: daughter "was much more relaxed when with Father," daughter "has been outgoing and friendly to her new peers and appears happy," daughter "seems more relaxed and happy," and daughter's "level of anxiety has diminished." Additionally, the court found that daughter's "transition to Father's home has gone surprisingly well" and that "she has relaxed and grown comfortable with father as the primary caretaker." Moreover, the changed circumstance that the court identified—mother's persistent belief that father molested daughter—formed the basis for its best-interests analysis, and in determining what was in daughter's best interests, the court relied heavily on Dr. Halikias's report. The court found Dr. Halikias credible and admitted his report into the record. According to Dr. Halikias, "[mother] is certain [father] sexually abused [daughter]" and mother "will act, covertly or overtly, on her convictions and convey to [daughter] that her father hurt her and is dangerous." "[Father] proved more able and willing to foster a

positive relationship between [daughter] and her mother than vice versa." Finally, "[mother] needs [daughter] to play the role of an injured child with severe emotional problems. . . . [Daughter] acting happy with or attached to her father violates that script." Thus, there was more than sufficient evidence in the record to support the trial court's conclusion that it was in daughter's best interests that she remain in her father's custody.

Affirmed.

FOR THE COURT:

_____

Associate Justice

16