NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2017 VT 5

No. 2016-249

In re A.M., E.M., L.M., Juveniles

Supreme Court

On Appeal from
Superior Court, Franklin Unit,
Family Division

January Term, 2017

Thomas Z. Carlson, J.

Matthew F. Valerio, Defender General, Marshall Pahl, Appellate Defender, and Kerrie Johnson, Law Clerk (On the Brief), Montpelier, for Appellant Father.

William H. Sorrell, Attorney General, Montpelier, and Jody A. Racht, Assistant Attorney General, Waterbury, for Appellee State.

Michael Rose, St. Albans, for Appellees Juveniles.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1.   **ROBINSON, J.**   Father appeals from a family court judgment modifying the disposition plan and terminating his parental rights to the minors A.M., E.M., and L.M. We conclude on the basis of the record in this case that a single transgression by father, in the face of otherwise positive evidence and findings as to his compliance with the case plans and his observed parenting abilities, did not support a finding of changed circumstances to warrant modification of the case plan goal. Accordingly, we reverse.

¶ 2.   The procedural history and trial court findings are as follows. The three children who are the subject of this proceeding were eight, six, and two and a half years old at the time of final hearing in this matter. The parents, who are not married, were in their late teens when they

started having children. The Department for Children and Families (DCF) first filed a CHINS (children in need of care and supervision) petition in September 2011 after reports of inadequate supervision of L.M. and E.M. The case resulted in a conditional care order subject to DCF supervision. After apparent progress by both parents toward the case plan goals, the case was dismissed about a year later.

¶ 3. The parents' relationship has been marked by periodic separations and turmoil. Father contested paternity as to each of the children, and mother obtained several relief from abuse (RFA) orders against father over a period of years. Between the summer of 2012 and the summer of 2014, the parents were mostly together with the children. Father worked third shift and did not participate much with the children; mother did all the diapering, laundry, shopping and cooking. In July 2014, father left after a serious argument. He moved to New York, about an hour and a half away from mother's home. The children remained with mother full time.

¶ 4. The trial court heard the most recent petition for an RFA order in September 2014.[1] At that hearing, father acknowledged that he and mother "argued almost every day." The court found that over the years father had struggled to control his temper. In the past, he had grabbed mother by the throat and thrown her into a wall on one occasion, and on another he grabbed her and threw her on the bed. The court found that in September 2014 father angrily confronted mother and grabbed and smashed her phone, yelling at her all the while. On the basis of this conduct, the court issued an RFA order through September 15, 2015. The children were not present for the events of September 2014 that gave rise to the last RFA order, but were present in the past when father grabbed and pushed mother.

¶ 5. During the months leading up to the CHINS petition, under the terms of the September 2014 RFA order, father had visits with all the children on alternate Saturdays, which

_____

[1] The record reflects that this RFA petition was filed in response to an altercation between parents during an encounter in September after father had moved out the preceding summer.

2

he attended regularly. He visited the children at his father's house in Vermont. During this time, father filed a motion to modify parental rights and responsibilities in the family court. The State filed a CHINS petition before the hearing on father's motion to modify, so father's motion was not heard.

¶ 6. The State filed the CHINS petition leading to the current proceeding in December 2014. The children were in mother's custody at the time, and mother and the children were living with the children's maternal grandmother. The petition alleged a lack of supervision, unsafe adults in the home, ongoing domestic violence (with mother's new partner), and a home inspection that found mother's home and the children to be in an impoverished and unhealthy state of affairs. The trial court found that the triggering event leading to the CHINS petition was further deterioration in mother's mental health. The State filed the petition on the day mother was admitted to the hospital with an apparent overdose. Several months earlier, she had been hospitalized for three days due to mental health issues. In the meantime, DCF had engaged with mother concerning significant health and hygiene issues in the home.

¶ 7. On December 1, 2014, pursuant to an emergency care order, the children were removed from the home where they lived with their mother and placed in foster care.

¶ 8. The court held a temporary care hearing in December 2014. Father sought custody, but DCF opposed it based on the history of domestic violence against mother and DCF's inability to supervise a New York placement. The hearing on temporary custody was ultimately rescheduled to March 2015, and essentially combined with the merits hearing. In the meantime, the court allowed father to continue his weekly Saturday visits with the children as outlined in the RFA order.

¶ 9. At the merits hearing on March 18, 2015 mother stipulated to an adjudication of CHINS based on her inability to provide adequate care or a safe living environment. Father did not oppose the CHINS finding, but because he was not the custodial parent at the time of the

CHINS filing and his stipulation was not necessary to support the CHINS adjudication, he did not join the stipulation. The court made a CHINS finding and ordered DCF to prepare a disposition plan.

¶ 10. Father again sought custody pending disposition. DCF, mother, and the children all opposed father's request—at least until they saw the outcome of a home study in New York that DCF had initiated. The court began a hearing on father's request. After father's testimony, it became clear that the court did not have enough time to hear from father's other witnesses, mother's witnesses, or the State's witnesses. The court indicated that it would set a continued hearing to complete the evidence. The next hearing, in May, was the disposition hearing itself, effectively mooting the question of the children's placement pending disposition.

¶ 11. Throughout the period between the emergency care order and disposition, mother saw the children only in a supervised setting in the Family Time Program at the Northeastern Family Institute (NFI). She saw the children together for about an hour each week. Although he lived a considerable distance away, father was invited to have similar NFI-supervised contact with the children, including evenings, in order to try to accommodate his work and living schedule in New York. He was unable to arrange visits in the Family Time Program but maintained his day-long visits on Saturdays at his father's home in Vermont. The trial court found "no evidence of anything negative about those visits," and they later supported DCF's "increasing focus on [father] as the potential custodial parent."

¶ 12. DCF's proposed disposition plan, filed with the court in late April 2015, recommended concurrent goals of reunification, initially with mother and if that did not work out then with father, or adoption. With respect to mother, the plan acknowledged some efforts at counseling, cleaning up her home, and keeping her own medical appointments, but emphasized that mother needed to demonstrate accountability for her behaviors such as minimizing the past threats to her children posed by lack of supervision and not consistently engaging in mental health

4

treatment. The plan's goals for mother included demonstrating the ability to care for herself independently and ensure her own safety; demonstrating the ability to recognize the children's physical, emotional, and special needs; providing a safe and stable home environment for her children, free from domestic violence, drugs and physical or verbal abuse; developing a healthy and safe support system; demonstrating the ability to self-regulate and resolve conflict in healthy ways; and accepting responsibility for her current and past behaviors.

¶ 13. In pursuing these goals, mother was expected to undergo counseling, meet with a domestic violence agency, sign releases as requested by DCF, participate in team and individual meetings with DCF and abide by agreements therein, allow unannounced home visits, follow a consistent plan of contact with her children, attend medical and dental appointments, maintain contact with the children's educational, medical, daycare, dental and developmental service providers, maintain housing free of drugs, alcohol, domestic violence and physical and verbal abuse, obtain a stable source of income, notify DCF immediately of any incidents requiring professional intervention, and participate in a psychological evaluation. The plan contemplated that "[i]f [mother] is unable to make the necessary changes for her children, DCF will look to [father] for reunification. It is expected that [mother] will make significant progress by August 1, 2015 . . . If mother has not made significant progress by August 2015, DCF will begin to look at [father] for reunification."

¶ 14. The goals with respect to father were similar—he was expected to protect his children from physical, sexual and emotional abuse, accept responsibility for his choices and behavior, and demonstrate the ability to recognize the children's physical, emotional and special needs and prioritize them over his own basic needs. Father had a largely similar list of specific planned tasks, minus the counseling requirement. He was expected to fully participate in DCF meetings, maintain consistent contact with the children, demonstrate his understanding of the children's needs, and maintain employment and a suitable home for the children, free from

5

domestic violence.  The plan did not call for father to engage in any particular social or mental health services.

¶ 15.  The disposition hearing was in May 2015.  Father indicated through counsel that he did not object to the case plan or its goals except that he argued that the plan should not prioritize reunification with mother over reunification with him at least until there was an order on the temporary care hearing or review of the New York home study.  Father also indicated that he still sought custody.[2]  After further discussion, father's counsel stated that he would reserve presenting any further evidence on the custody issue until completion of the home study.  The court approved the disposition plan.

¶ 16.  The court noted that the post-disposition review hearing was likely to overtake any continued hearing on the placement question.  Rather than schedule a continued hearing on father's request for custody, the court indicated that it would rely on the post-disposition review for that purpose.  It also invited the parties to request a hearing if the home study presented new information that called for such a hearing.  Over the objection of the State, and recognizing the challenges father faced in mobilizing his witnesses for repeated hearings, the court indicated that if father wished to present further evidence on the question of the child's custodial placement after reviewing the New York home-study report, he could present his witnesses' testimony in writing subject to follow-up cross-examination, or by telephone.  The New York report was completed shortly thereafter, but was not filed with the court until September 30, 2015.

¶ 17.  Beginning in June 2015, mother began seeing her oldest child in separate visits from the other two because of his disruptive behavior.  From June to October, the visits apparently

---

[2]  Father's statement that he did not object to the case plan was inconsistent with his continued request for "temporary custody," since the case plan expressly contemplated custody with DCF.  However, it is clear from the discussion at the hearing that father did not object to the ultimate goals of the case plan, but, contrary to the terms of the case plan, sought placement with him while the plan played out.

went well. Mother complied with most of the stated tasks in her case plan, with the significant exception of maintaining a counseling program. The court found this fact significant given how far mother had to go in understanding her own situation before she could interact positively with people trying to help her children. The court noted that there was also only scant evidence of initiative on mother's part to connect with the children's service providers. By all accounts, she was consistent with the plan for her contact with the children.

¶ 18. By late August, DCF concluded that mother was not going to meet their expectations. DCF shifted the focus of reunification efforts to father, and developed a plan for him to see the children for two full weekend days with an overnight at paternal grandfather's home in Vermont starting in mid-September 2015. By that time, the RFA order from September 2014 had expired. At that time, father's parenting skills had been reviewed very positively by an NFI professional who wrote that father "appears to be well rounded in his parenting skills and has a very good understanding of what each of his children need in order to thrive in their individual developmental and emotional growth." No further coaching was recommended.

¶ 19. DCF met with father on September 16 and developed a plan for him to start seeing the children for two full weekend days and then to start having overnights at his father's home— one on September 19 with just one child, and then every Saturday starting the subsequent Saturday, September 26.

¶ 20. The events of that first weekend, beginning September 19, proved pivotal. The trial court found that despite knowing that DCF would be upset and that mother was still limited to supervised contact with the children, and in spite of all the history of abuse petitions and daily arguments, father contacted mother—the RFA order having expired a few days before—and invited her to meet him and the children at a local park. Father wanted them all to be back together again, and decided "on the spur of the moment" to stay overnight at mother's home with all of the children. By all accounts, the day and night were relatively uneventful. Mother said that the kids

7

seemed to enjoy it all and did not want to leave. In the later decision terminating father's parental rights, the court found that the children were confused and hurt by this incident. There was evidence that during the visit father informed the children that they were all going to be reunited. The court found this was emotionally unsettling for L.M.

¶ 21. When DCF learned of the unauthorized family reunion from one of the foster parents, they abandoned the plan of expanded visits with father or reunification with either parent. Instead, the State changed its plan to termination of both parents' parental rights. DCF filed the petition to terminate on October 20, 2015.

¶ 22. In the meantime, on September 29, 2015, father filed the completed New York home study with the court.[3] The report found no contraindication to father having the children in his home and caring for them. It noted that he had family resources and financial stability, his home was considered safe and large enough to accommodate the children, and he was willing to access necessary support services. Consistent with the court's indication at the May 2015 disposition hearing that it would consider father's request for custody upon submission of the completed home study, father requested return of custody to him.

¶ 23. In October, father lost access to his father's home in Vermont for the purposes of father's visits with the children. Father asked the court for permission to take the children for his visits with them to the home in New York that had been approved pursuant to the New York home study. After the September 19 weekend, DCF halted any plans to expand father's visits with his children, but father was still entitled to daytime visits every other Saturday pursuant to the May 2015 disposition order.

¶ 24. The court held a hearing in November, focusing specifically on what the parties' expectations had been in connection with the September 19 visit, and whether father had

---

[3] The report was apparently completed and provided to the DCF caseworker on this case in mid-May 2015. It is not clear why the report was not filed sooner with the court.

8

permission to include mother in their weekend. The court found that father had planned in advance to initiate a visit with mother and the three children, that he did so despite his knowledge of a case plan that reflected significant concerns about the state of mother's home and her mental state, and that by doing so he had placed his own needs and desire to be a family over the children's needs. The court acknowledged that the children had fun through the weekend, but emphasized that was not the issue. On the basis of these findings, the court ordered that father could continue his every-other-Saturday all day visits, but they must be supervised and must take place in Vermont.

¶ 25. Between the September incident that led to DCF changing its proposed case plan goal to termination and adoption, and the hearing on its TPR petition, mother continued to see the children weekly. For a period, she visited with all three children together. In March 2016, for reasons having to do with the children's collective needs, and not any fault on her part, mother began visiting separately with each of the children. Father did not see the children during this time.

¶ 26. The trial court found based on an expert evaluation of mother that she had long established personality traits that cause her to blame other people, institutions, and circumstances, while accepting little to no personal responsibility for her circumstances. These traits left her with a poor prognosis for developing insight into and addressing her problems, and meeting the children's needs. With respect to father, the court wrote, "We do not have the benefit of a similar evaluation of [father], but similar conclusions are hard to avoid. There is a combination of lack of understanding/minimization of the children's needs and hostility to helping hands that does not bode well for the children in his care."[4]

---

[4] Although the trial court compared its conclusions about father's personality traits to the expert's conclusions about mother's prognosis, the court's conclusions about father derived from its observations of his behavior rather than any expert evaluation or testimony. The court's own observations about father's behavior, and the conclusions it has drawn, are not insignificant, but they are not expert conclusions as to father's clinical prognosis based on competent evaluation.

¶ 27. Since the emergency care order, the children have lived individually, together, or in various combinations with a total of seven different foster parents. Each of the children has significant behavioral issues ranging from aggressiveness with others to taking things that belong to others, hoarding food, and getting "wound up." The court concluded that the various attention-getting behaviors in each child was a result both of a lack of attention when they were with their parents and a reflection of the kind of behavior they witnessed by their parents. The court concluded that the children's behavior was not a result of their experiences in foster placement.

¶ 28. The court held an evidentiary hearing on the termination petitions over the course of three days in March, May, and June 2016. The court issued a written decision in July 2016. Based on the above findings, the court concluded that there had been a substantial change of circumstances in two key respects: one was stagnation in general, and the other was the events of September 19, 2015 in particular. The court prefaced its analysis with a few observations on the family situation, as follows:

> The court has given a lot of thought to the stagnation question in this case, starting from the reality that this "family" was to a large degree doomed from the start by way of the hard facts that three children were born to teenage parents with no money or significant family financial or emotional support, marginal prospects for employment and personalities that defaulted to harsh words and actions. That toxic mix translated into three children with significant behavioral challenges of their own. Expecting anyone to manage those circumstances to the benefit of the children as an intact threesome, even without the personalities involved, would be a very tall order. A term of counseling for [mother] was never going to be a magic wand enabling her to manage all three children, and the change in direction toward [father] as a potential custodial parent for all three children appears to have been an exercise in wishful thinking at best. This reality puts the "litmus test" of compliance with the April case plan in perspective. Both parents could have fully complied with every task in that plan and the Court does not believe it would have changed the outcome in this case. Otherwise stated, there is no question in the court's mind that both parents in this case are handicapped by personality, experience and lack of assets to build on, but the task at hand would have daunted the fully equipped. As it was, one foster parent after another struggled with the children, and DCF had to continue experimenting with both foster placements and supervised contact arrangements.

10

¶ 29. Despite these handicaps, the court concluded that, "by way of truly committing themselves to the goals of the April 2015 case plan, as well as the tasks, one or both of the parents might well have made the kind of progress that would have demonstrated at least emerging abilities to understand the children's emotional needs, prioritize the children's needs over their own, and take responsibility for past choices and behavior."

¶ 30. The court characterized the events of September 19, 2015 as the "closer," describing them as a "giant step backward at a critical time" which persuaded the court that there had been no significant improvement in either parent's ability to care properly for the children. In particular, DCF argued, and the court found, that father's (and mother's) actions "demonstrated [a] fundamental lack of commitment to goals set out in the Case Plan." The court concluded that parents' actions "demonstrated a lack of understanding of the children's emotional needs, inability to prioritize their children's needs over their own, and inability to take responsibility for past choices and behavior."

¶ 31. Turning to the children's best interests, the court found that their need "above all" was for "a greater sense of permanence and stability." The court concluded that "neither parent gives the court any confidence they can meet that need, now or in the foreseeable future," observing that father had "made a really bad decision at a critical time and has not shown any indication of insight or made any significant effort to rebound from that chapter." Finally, the court found that the children had adjusted well to their current foster placements, which "appear to be on track to provide permanence and stability." The court concluded that a termination of both parents' parental rights was in the best interests of the children. Only father has appealed the ruling.

¶ 32.    On appeal, father challenges the trial court's finding of changed circumstances to support modification of its disposition order.[5]    His argument calls for an assessment of the sufficiency of the evidence as well as an assessment of the procedural course of this case.

¶ 33.    With respect to the evidence, father argues that the court found that he had "mostly fulfilled" the tasks identified in the April 2015 disposition plan, and that the plan did not identify— or require that he address—any deficits in his parenting abilities.  Father points to a favorable assessment of his parenting abilities by NFI in late August and early September 2015, shortly before DCF changed the goal to termination.  This assessment was part of the basis for DCF's determination by early September 2015 to focus its reunification efforts on father, and to increase his visits with the children.[6]    Father thus contends that the only substantial evidence of changed circumstances identified by the court was the incident of September 19, 2015, and that this was insufficient to support the finding of stagnation.  The court's decision was further undermined, father claims, by its assertion that the family was "doomed from the start" by virtue of the parents' age, and lack of "money or significant family financial or emotional support."  In addition, father points to the procedural history of this case, arguing that the court's interlocutory ruling leaving

---

[5]    Father also challenges the trial court's best interests analysis to support termination. Because we agree with father that the petition to modify the approved case plan and proceed to termination of his parental rights was not supported by sufficient evidence of changed circumstances, we do not reach the best interests question.

In addition, father presents statistical and scholarly critiques of DCF's conduct, the clogged court docket, and the activities of the St. Albans region DCF office in particular.  He cites data indicating that the percentage of children in DCF custody in Vermont is at the highest end of the spectrum relative to national figures, and that the rate of DCF custody of minors in the region served by the St. Albans office is nearly double Vermont's already relatively high rate.  These data may present important questions for policymakers, but offer little to the resolution of this particular case.  We agree with father that the breadth of discretion afforded to child protection workers and the importance of the interests at stake call for vigilant and individualized court review in abuse and neglect cases.  For that reason, we have focused our review on the record in this case.

[6]    The State notes that father cites a reference to the NFI assessment in DCF's October 2015 proposed case plan, which was not admitted into evidence, but acknowledges that the DCF social worker testified about the plan at the hearing.

custody with DCF pending receipt of the home study was error and undermines the stagnation finding.

¶ 34. This Court will not disturb a trial court's findings unless they are clearly erroneous, nor its conclusions if reasonably supported by the findings. In re K.F., 2004 VT 40, ¶ 8, 176 Vt. 636, 852 A.2d 584 (mem.). It is equally settled that parents enjoy a fundamental right to the care and custody of their children, and that, accordingly, the "awesome power of termination should be invoked only as a last resort when there is no reasonable possibility that the causes and conditions which led to the filing of the petition can be remedied and the family restored within a reasonable time." In re D.A., 172 Vt. 571, 573, 772 A.2d 547, 551 (2001) (mem.) (quotation omitted). It is for this reason also that we must apply a more exacting "clear and convincing" standard of proof in termination proceedings, requiring "convincing proof and findings that the parents are unfit and demonstrably incapable of providing an appropriate home, and that separation is necessary for the child's welfare." In re M.B., 147 Vt. 41, 45, 509 A.2d 1014, 1017 (1986).

¶ 35. For the reasons set forth below, we conclude that the State did not establish grounds to modify the case plan goal to terminate father's parental rights. In reaching this conclusion, we consider the case plan itself, evidence of father's satisfaction of the case plan goals apart from his conduct the weekend of September 19, the events of that weekend, and the applicable legal standard.

¶ 36. The case plan approved by the court in May 2015, defining the goals for father to achieve and the tasks to perform toward achieving those goals, provided few specifics with respect to father's identified parenting deficiencies and the improvements he was expected to make.[7] The

---

[7] The trial court emphasized that the parents' achievement of the goals of the case plan, rather than their performance of the specified tasks, was the primary focus of its analysis. We agree. See In re D.M., 2004 VT 41, ¶ 7, 176 Vt. 639, 852 A.2d 588 (mem.) (observing that case plan "is not intended to be a mere checklist the parent must satisfy to ensure the automatic return of the children," and that critical question is not whether parent has completed every program but "whether the individual parent has demonstrated the improvement contemplated").

13

plan did not attribute to father substance abuse issues, mental health issues, an inability to provide safe and hygienic housing for the children, or a failure to meet their nutritional or medical needs. It did not call upon father to engage in any social services or mental health treatment. It called for him to maintain a safe, stable home and a stable income, but did not contain any information suggesting that he needed to make changes with respect to either of these goals. He was encouraged to participate in team meetings with DCF as scheduled, and to maintain consistent contact with his children and their service providers. The narrative sections of the case plan describe father's past acts of verbal abuse and violence toward mother—primarily in the context of discussing the effects of that conduct on mother and her parenting abilities. It noted that he completed a domestic violence education program in 2012. But the approved case plan goals and plan do not identify father's domestic violence as a particular risk to the children calling for specific intervention or programming as a prelude to reunification.

¶ 37. Apart from the events of the weekend of September 19, there is scant evidence that father failed to meet the case plan goals. There is no evidence that he failed to maintain a source of income and safe and appropriate housing.[8] In fact, as discussed further below, father's determination to keep his job became an impediment to his ongoing contact with the children after the court imposed a supervised visitation requirement when the available supervisors were available only during the work week. Until that time, father consistently took advantage of his Saturday contact time with the children. The trial court expressly found "no evidence of anything

---

[8] In its decision, the trial court called into question the reliability of the New York home study, noting that father's "steady employment" documented in that study turned out to consist of six different jobs since the children were taken into custody, and that father's family support system has suffered as a result of his own father's backing away and his mother having health and personal issues of her own. The court noted that the house father was living in at the time of the home study had since been deemed uninhabitable, but acknowledged that father had moved into the adjoining home as he had told the New York authorities he would. Although the court expressed skepticism about the New York home study, and noted that father had multiple jobs during the period in question, it did not find that father had failed to maintain safe and appropriate housing or a stable income. The DCF caseworker testified that he had no basis for challenging the conclusion of the New York home study that father's home was safe and suitable.

negative about those visits," and noted that these visits supported DCF's "increasing focus on [father] as the potential custodial parent." There is no evidence that father was notified in advance of medical or educational appointments involving the children, or that it would have been reasonable for him to attend given his work and the distance between his home and the homes of the children. Father participated in case planning meetings with DCF in May 2015 and again in September, after DCF shifted to the alternate goal of reunification with him. And father cooperated with a parenting assessment by NFI and the family support program. The DCF caseworker described the report as "pretty favorable."

¶ 38. In sum, before the events of September 19, there is no evidence to support a finding that father was stagnating with respect to achieving the case plan goals. In fact, the evidence of record reflects that he was substantially compliant with both the letter and spirit of those goals. The question, then, is whether father's conduct on the weekend of September 19 was sufficient to trigger a finding of changed circumstances that could warrant modification of case plan goal to termination of parental rights with respect to father.

¶ 39. We acknowledge at the outset that there was ample evidence to support the trial court's conclusion that father's conduct demonstrated a lack of understanding of the children's emotional needs and an inability to prioritize the children's needs over his own. Even though DCF acknowledged that it never explicitly told father that he could not include mother in his visit with the children, the evidence supports an inference that father knew that mother was limited to supervised visits and that DCF would not approve of his actions. Given mother's documented parenting challenges and supervised visitation requirement, and the evidence of father's past verbal and physical abuse of mother, DCF's concerns about father's conduct were reasonable.

¶ 40. But we reject the conclusion that father's lapse in this instance was so severe that it warranted immediate modification of the case plan from a goal of reunification with father to a goal of termination without any remedial response by DCF. DCF never advised father that its

15

support for reunification with father was contingent on father and mother not getting back together. In response to father's conduct, it did not warn him that future attempts to expose the children to their mother outside of her own supervised visitation could result in a change of DCF's proposed case plan goals. The DCF worker reasonably concluded that father's conduct showed a lack of insight into the children's needs. But DCF's response was not to work with father to develop a plan to help father gain that insight. It did not encourage father to engage in counseling or other process to sensitize him to the ways in which his actions were potentially harmful to the children, or to help him learn to prioritize the children's needs. Instead, the DCF worker testified that after that incident he "couldn't work with [father] in good faith." From that point forward, DCF efforts to promote the plan of reunification with mother, or alternatively father, approved by the court in May 2015 effectively ceased, as it turned its attention to its new goal of termination and adoption. Simply put, DCF jumped the gun.

¶ 41. In reaching this conclusion, we are influenced in part by the vagueness of the case plan as it related to father, and the evidence noted above that, apart from the September 19 incident, father was in compliance with the case plan and on track for possible reunification. Until August, DCF, consistent with the case plan, focused its attention on reunification with mother. We are also mindful of the State's high burden to prove sufficient changed circumstances by clear and convincing evidence. See In re R.W., 2011 VT 124, ¶ 15, 191 Vt. 108, 39 A.3d 682 (holding that in termination of parental rights case, State has burden to prove both changed circumstances and best interests by clear and convincing evidence).

¶ 42. One factor that complicates the analysis is father's lack of engagement with the children after DCF changed its proposed case plan goal to termination, but before the court's eventual hearing on DCF's petition. As the court noted, after the September 19 incident, and DCF's reaction to it, father "appears to have left the field." We conclude that father's lack of

16

engagement pending the final hearing in this case does not create the changed circumstances that were lacking when DCF filed the TPR petition for several reasons.

¶ 43.   First and foremost, the trial court's own changed circumstances analysis turns entirely on the September 19 incident, and does not rely in any part on father's subsequent conduct. The trial court considered father's lack of contact with the children in its best interests analysis but not as a factor supporting its changed circumstances finding.

¶ 44.   Even if we were to consider supplying an alternate rationale for the changed circumstances determination, on the record of this case, the gap in father's contact with the children does not clearly meet the standard.  The extent of DCF's efforts to facilitate father's contact with the children after the September 19 incident is unclear.  As noted above, as a result of the September 19 incident, the DCF caseworker determined that he could not work with father.  DCF abandoned efforts to promote any expansion of father's time to visit with the children beyond the daytime every-other-Saturday schedule reflected in the approved disposition plan, and advocated, successfully, for an order requiring that father visit the children in Vermont, with supervision. Father testified that until January 2016, he worked full time during the week.  Given the long travel distance to Vermont, he was limited to weekend visits.  A witness from NFI testified that NFI was not available to supervise weekend visits.  Father's own father declined to serve as a supervisor and, perhaps with good reason, DCF rejected the only proposed supervisor offered by father.  As a result of these factors, through much of the period in question, father had no practical means of taking advantage of the supervised visitation option.[9]

---

[9]   There was evidence that pursuant to DCF's referral, in October 2015 NFI attempted to set up a telephone meeting that included father.  A witness from NFI testified that she tried multiple times that month to reach father, and that father sent her a text message saying that missing work was not an option and he was not able to do a meeting.  The witness testified that NFI was not available to facilitate a meeting on a weekend, but could start a meeting as late as 6:30 p.m. during a weeknight.  Father testified that he worked every day from 10:00 a.m. to 6:30 p.m. at that time. Given the absence of an approved supervisor for visitation, it does not appear that a telephone meeting, assuming it could have been arranged, could have cleared the way for more contact.

17

¶ 45. To be clear, we do not assume that these children will successfully reunify with father. Any effort to reunify will require great effort by father, and cooperation with an agency he clearly distrusts. We do not doubt that, especially in light of his absence from the children's lives for many months and the event that led to DCF's change of position, father has work to do.

¶ 46. The question we address here is whether, given the case plan goals and requirements, the evidence concerning father's compliance with those goals, and the record evidence concerning father's parenting capacities, the State met the standard of showing by clear and convincing evidence that father's conduct during the weekend of September 19, 2015 gave rise to a sufficient change of circumstances to warrant modification of the case plan goal of reunification with father to one of termination.[10] We conclude on this record that it did not.

Reversed.

FOR THE COURT:

_____

Associate Justice

---

[10] We reject the State's claim that in this case mother's stagnation provided a sufficient basis for modifying the disposition goal with respect to father. This is not a case in which the approved disposition plan contemplated reunification with both parents together, such that the failure of one parent to progress impacted the continued viability of the plan as approved. In this case, the approved disposition plan provided for reunification with mother, individually. It specifically contemplated that mother's efforts to reunify might falter, and provided in that circumstance for reunification with father. Mother's stagnation did not nullify the assumptions built into this case plan or render the approved disposition goal unattainable. The possibility of mother failing to progress was expressly contemplated and baked into the approved disposition plan.