NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2020 VT 84

No. 2019-408

| Megan Lanfear | Supreme Court |
|---|---|
| | On Appeal from |
| v. | Superior Court, Rutland Unit, Family Division |
| Jamie Ruggerio and Lisa Diane Fennimore | April Term, 2020 |

Cortland Corsones, J.

Megan Lanfear, Pro Se, Middlebury, Plaintiff-Appellant.

Pamela D. Gatos of Kenny & Gatos, LLP, Rutland, for Defendant-Appellee Fennimore.

PRESENT: Reiber, C.J., Robinson, Eaton, Carroll and Cohen, JJ.

¶ 1. **CARROLL, J.** Plaintiff appeals the family division's decision declining to adjudicate her a de facto parent of J.F. pursuant to 15C V.S.A. § 501(b). The family division found that plaintiff had failed to demonstrate by clear and convincing evidence four of the seven factors outlined in § 501 to be recognized as a de facto parent—namely that the person seeking de facto parentage "undertook full and permanent responsibilities of a parent of the child without expectation of financial compensation"; held out the child as their own; "established a bonded and dependent relationship with the child that is parental in nature;" and that "continuing the relationship between the person and the child is in the best interests of the child." Id. § 501(a)(1)(C)-(E), (G). Plaintiff argues that she proved the above-mentioned factors by clear and convincing evidence. We affirm the family division's decision.

¶ 2.     The family division made the following findings of fact. J.F., born in January 2015, is the biological son of mother and father.[1]  Mother is forty-one years old and works as a high school teacher.  Plaintiff was a high-school student of mother during 2011-2012 and 2013-2014.  Because plaintiff came from an abusive household, she relied on mother for moral support.  When plaintiff turned eighteen, she was kicked out of her home, and mother offered her a place to stay.  Plaintiff accepted and moved into mother's and father's home in the fall of 2014.  Mother was pregnant with J.F. at the time.  Plaintiff paid $100 a month for utilities and helped with chores.  Two weeks after moving in, plaintiff left the home to attend college in northern Vermont.  She returned on the weekends.

¶ 3.     Between the fall of 2014 and March 2015, plaintiff and father developed a romantic relationship, which turned into a sexual relationship.  At some point thereafter, mother was invited into the relationship.  Although mother accepted the invitation, the primary relationship remained between plaintiff and father.  For example, mother tried to set up dates with father, but father thought it was unfair to make plaintiff stay home with J.F.  Father and plaintiff occasionally went on dates in the evenings, however, and when they did, mother stayed home with J.F.  Nevertheless, the three of them slept in the same bed and eventually got matching tattoos and rings.  There was concern, however, that the nature of the polyamorous relationship would ruin mother's career as a high school teacher.  Due to this concern, the parties agreed to keep their relationship secret.

¶ 4.     During mother's pregnancy, father did not want attend to attend mother's prenatal doctor's appointments because he was squeamish about doctors.  Because plaintiff was interested in medicine, she wanted to attend.  Mother and father agreed that plaintiff should attend mother's prenatal visits.  The parties agreed that plaintiff and father would be present for J.F.'s birth, and plaintiff would cut the umbilical cord.  The parties also agreed that J.F. would call mother "mommy," father "daddy," and plaintiff by her first name.  In a Facebook post, dated January 5,

---

[1] Father did not participate in this appeal.

2

2015, mother expressed her support for plaintiff's help since moving in that fall and referred to her as a "parental figure."

¶ 5.     After J.F.'s birth, plaintiff sent out the birth announcement to friends and family. Mother went on maternity leave and cared almost exclusively for J.F.  After seven weeks, mother returned to work.  While mother was at work, plaintiff and father cared for J.F.  At the time, father did not work, and plaintiff had transferred to another school as an online student and lived with mother and father full time.[2]  Between father and plaintiff, plaintiff provided more of the care for J.F.  When mother was at home, she exclusively cared for J.F., which included before work, after work, and during weekends and holidays.  If mother was late in returning home or early in going to work, plaintiff and father would get mad at her.  Plaintiff and father also accused mother of spending too much time on her phone when she cared for J.F.  In June 2017, mother again expressed her support for plaintiff's help in a Facebook post and referred to plaintiff as a "[p]art dad, part mom."  In September 2018, J.F. started preschool and mother handled all school-related matters.  This reduced the amount of time father and plaintiff cared for J.F.

¶ 6.     Around January 2019, unbeknownst to father and plaintiff, mother consulted a divorce lawyer.  After finding a document from mother's lawyer, father called mother insisting that she come home immediately.  When she arrived, father and plaintiff confronted her, demanded that she hand over her phone, and when she did, they found evidence that she was having an affair. As retaliation, they took and withheld mother's phone, her high-heeled shoes—which they referred to as her "whore shoes"—and her makeup.  Father and plaintiff told mother she could not leave them and that she must continue working to provide for the family.  They looked up FBI interrogation methods, including sleep deprivation techniques, and attempted to employ them on mother.

---

[2] Eventually plaintiff started a part-time job, although it is unclear when this job began.

¶ 7.    Soon after learning about the affair, father attacked mother in their home, hitting her and pulling her hair.  Based on this incident, mother obtained an emergency relief-from-abuse (RFA) order against father, and he was charged with criminal domestic assault.  The RFA order required father to vacate the home and awarded mother temporary custody of J.F.  Mother and father eventually agreed to a "no findings" final RFA order that ended on October 1, 2019 and permitted father to have supervised visits with J.F. once the criminal conditions of release allowed for such contact.

¶ 8.    Although plaintiff was not implicated in the claims supporting the RFA order against father, she left the home when he was forced to leave and moved into a hotel room with him.  Plaintiff returned to the home every day for ten days to feed her cats.  But after ten days, mother changed the locks.  To retrieve her items, plaintiff sent mother's lawyer an email asking to gain access to the house where she referred to herself as a tenant who paid rent and "[p]rovided free daycare for the child."

¶ 9.    Following these events, mother filed for divorce.  While the divorce action was pending, plaintiff made serious accusations to mother's employer, which could have cost mother her job.  Mother was placed on paid administrative leave for five weeks while the accusations were investigated.  Mother was eventually exonerated and returned to work.  After plaintiff made the allegations, mother tried to ensure that there was no contact between plaintiff and J.F. because she was concerned plaintiff would try to turn J.F. against her.  Plaintiff and father are in a committed, long-term relationship.  Plaintiff filed her complaint for parentage in March 2019 once it became clear that mother would not allow her to see J.F.[3]

¶ 10.    Evidentiary hearings were held in October 2019.  Following these hearings, the family division issued a written decision declining to adjudicate plaintiff as a de facto parent.  The

_____

[3] In July 2019, mother and father reached a temporary stipulation for parental rights under which (1) mother would have sole legal and physical custody of J.F., (2) father could have non-supervised visits with J.F. every Tuesday from 1:30 to 6:30, and (3) plaintiff would have no contact with J.F.

4

family division explained that, pursuant to 15C V.S.A. § 501(a)(1), a person seeking to be adjudicated a de facto parent needs to prove the following by clear and convincing evidence:

> (A) the person resided with the child as a regular member of the child's household for a significant period of time;
>
> (B) the person engaged in consistent caretaking of the child;
>
> (C) the person undertook full and permanent responsibilities of a parent of the child without expectation of financial compensation;
>
> (D) the person held out the child as the person's child;
>
> (E) the person established a bonded and dependent relationship with the child that is parental in nature;
>
> (F) the person and another parent of the child fostered or supported the bonded and dependent relationship required under subdivision (E) . . . ; and
>
> (G) continuing the relationship between the person and the child is in the best interests of the child

¶ 11. The family division concluded that plaintiff had proven factors A and B because she resided with J.F. "as a regular member of his household for four years" and consistently cared for him during this period. However, plaintiff did not satisfy factor C because, although she engaged in consistent caretaking, her caretaking was more akin to a nanny than a parent who undertook "full and permanent responsibilities . . . without expectation of compensation." Id. § 501(a)(1)(C). With regard to factor D, the family division concluded that plaintiff did not hold J.F. out as her own child because the parties agreed to keep the nature of their relationship a secret; plaintiff held herself out as a caretaker; and J.F. referred to plaintiff in public and private by her first name.

¶ 12. Similarly, the family division concluded that plaintiff did not meet factor E because her relationship with J.F. was not parental in nature. Factor F was met because both plaintiff and father fostered the "bonded and dependent relationship." Id. § 501(a)(1)(F). Finally, the family division concluded that plaintiff had not proven factor G because—even assuming that plaintiff's relationship with J.F. was parental in nature—continuing the relationship was not in J.F's best

5

interests. The family division found that the relationship between mother, father, and plaintiff was stressful and unequal, which negatively influenced J.F. as evidenced by his difficulty sleeping, constipation, and bedwetting. It found that these problems ceased after the parties' separation. Because plaintiff did not establish all of the factors by clear and convincing evidence, the family division declined to adjudicate her a de facto parent.

¶ 13.  On appeal, plaintiff challenges the family division's findings and conclusions. She argues that its findings regarding factor C were clearly erroneous because the division of labor in polyamorous relationships is complicated and her role in the family was solely to watch J.F. during the day. When understood in this context, plaintiff asserts that although she only watched J.F. during the day, she acted as a parental figure in a polyamorous relationship. With regard to factor D, plaintiff similarly argues that had the family division taken the social complexities surrounding polyamorous relationships into account, there is sufficient evidence that she held J.F. out as her own child.

¶ 14.  Plaintiff also contends the family division erred in concluding that factor E was not met because the record indicates that (1) mother did not stop her from acting as a caregiver, (2) she attended medical appointments, and (3) she bought J.F. clothes, toys, and shoes. Finally, plaintiff challenges the family division's conclusion that continuing the relationship was not in J.F.'s best interests. She argues that the family division improperly assumed that J.F.'s difficulty sleeping, constipation, and bedwetting were caused by the relationship. Plaintiff posits that these behaviors could be related to J.F.'s age.

¶ 15.  Mother argues that the family division's findings are adequately supported by the record and that the court did not abuse its discretion in declining to adjudicate plaintiff a de-facto parent.

¶ 16.  "It is well settled that we will not disturb a trial court's findings of fact unless they are clearly erroneous." Kanaan v. Kanaan, 163 Vt. 402, 405, 659 A.2d 128, 131 (1995). We defer to the trial court's findings because it is "better situated to resolve any disagreements by taking

6

into account the weight of the evidence, the credibility of witnesses, and the persuasive effect of the testimony." Frogate v. Kissell, 138 Vt. 167, 169, 412 A.2d 1138, 1140 (1980). When findings are challenged on appeal, our role is limited to determining if they are "fairly and reasonably supported by credible evidence." Id. at 169, 412 A.2d at 1139. We will affirm a trial court's legal "conclusions if reasonably supported by the findings." In re A.M., 2017 VT 5, ¶ 34, 204 Vt. 198, 165 A.3d 1111.

¶ 17. Applying this deferential standard, we hold that the family division's findings were not clearly erroneous and adequately supported its conclusion that plaintiff had not proven factors C, D, E, and G by clear and convincing evidence.

¶ 18. To be adjudicated a de facto parent, a petitioner must prove the 15C V.S.A. § 501(a)(1) factors listed above by clear and convincing evidence. "Clear and convincing evidence is a very demanding standard, requiring somewhat less than evidence beyond a reasonable doubt, but more than a preponderance of the evidence." In re E.T., 2004 VT 111, ¶ 12, 177 Vt. 405, 865 A.2d 416 (quotation omitted). The clear and convincing standard "does not require that evidence in support of a fact be uncontradicted, but does require that the fact's existence be highly probable." In re Kane, 2017 VT 48, 204 Vt. 635, 637, 169 A.3d 180 (mem.) (quotation omitted). If the person seeking de-facto parentage proves all seven factors by clear and convincing evidence, and the child already has two parents, the court must then adjudicate parentage pursuant to 15C V.S.A. § 206 (requiring that competing claims of parentage be adjudicated by considering the best interest of the child based on six factors).

¶ 19. Plaintiff argues that the family division erred in concluding that she did not meet factors C, D, E, and G. We address each factor below.

## I. Factor C

¶ 20. Factor C requires a person seeking de-facto parentage to demonstrate he/she "undertook full and permanent responsibilities of a parent of the child without expectation of financial compensation." Id. § 501(a)(1)(C). The family division concluded that plaintiff failed

7

to prove this factor by clear and convincing evidence because her role in the family was more akin to that of a nanny than of a parent. It found that plaintiff took care of J.F. on a set schedule during the day when mother was at work. Plaintiff did not care for him on weekends, vacations, or during the evenings or overnight. Furthermore, the family division found that when father was forced to leave the home because of the RFA order, plaintiff voluntarily chose to go with him and left mother with all the responsibility for caring for J.F. Finally, the family division found that mother made all medical and school-related appointments for J.F.

¶ 21. On appeal, plaintiff argues that the family division failed to consider the unique nature of polyamorous families. According to plaintiff, the unique division of labor in her polyamorous relationship with mother and father required her to stop caring for the child once mother was home from work so that she could fulfill non-childcare related tasks necessary for the household. What the family division characterized as a nanny role was in fact the role of a fully and permanently engaged parent in a polyamorous household. Plaintiff also argues that the family division's finding that she voluntarily left the household was clearly erroneous.

¶ 22. In making findings, a trial court is required to consider "all the evidence bearing on the issues with impartial patience" and then formulate findings "couched in its own language." Krupp v Krupp, 126 Vt. 511, 513, 236 A.2d 653, 654-55 (1967). "The trial judge has a duty to make findings essential to the disposition of the issues properly before the court." State v. Huston, 2020 VT 46, ¶ 11, ___ Vt ___, ___ A.3d ___. Although courts must make findings, we leave it their "sound discretion . . . to determine the credibility of the witnesses and to weigh the evidence." In re A.F., 160 Vt. 175, 178, 624 A.2d 867, 869 (1993).

¶ 23. Here, the record indicates that the family division considered the full context of the polyamorous relationship and nevertheless determined that plaintiff did not prove factor C. The court made detailed findings regarding the nature of the polyamorous relationship, including that mother, father, and plaintiff were in a romantic relationship for almost four years. Considering this context, the family division concluded that plaintiff failed to demonstrate she undertook full

8

and permanent parental responsibilities because her role was more of a nanny or a girlfriend than a parent because she only watched J.F. on a set schedule while mother was at work; did not care for him on weekends, vacations, or at night; and voluntarily left the home when father was forced to leave. The record indicates that the family division considered and made findings regarding the parties' polyamorous relationship and chose not to assign it significant weight in regard to factor C. This was not an abuse of discretion.

¶ 24. Plaintiff also argues that the family division's finding that she voluntarily left the home following mother's RFA order against father is clearly erroneous. We disagree. Plaintiff testified that following the issuance of the RFA order, she was staying with father at a hotel because she "was really concerned about his wellbeing." The family division's finding is fairly and reasonably supported by credible evidence.

## II. Factor D

¶ 25. Factor D requires a person seeking de facto parentage to demonstrate that he/she held out the child as their own. 15C V.S.A. § 501(a)(1)(D). The family division concluded that plaintiff did not prove this factor based on the following findings: Mother, father, and plaintiff agreed to keep the nature of their polyamorous relationship a secret and J.F. called plaintiff by her first name in public and in private. Furthermore, when mother locked plaintiff out of the house, plaintiff sent an email to mother's lawyer and referred to herself as a tenant who paid rent and provided daycare to J.F.

¶ 26. Plaintiff again argues that the family division erred because it failed to consider the social complexities and nuances of a polyamorous relationship. If these complexities are taken into account, plaintiff argues that she proved factor D because mother acknowledged in two Facebook posts that plaintiff was a parent to J.F., mother allegedly testified that it made her jealous to think that the public saw plaintiff as J.F.'s mother, and it is not unusual for a child to refer to a non-biological mother by her first name.

9

¶ 27. We reiterate that "[a]s the trier of fact, it [is] the province of the trial court to determine the credibility of the witnesses and weigh the persuasiveness of the evidence." Cabot v. Cabot, 166 Vt. 485, 497, 697 A.2d 644, 652 (1997). "A determination by the trier of fact must stand if supported by credible evidence, even if inconsistencies or contrary evidence exists." Bruntaeger v. Zeller, 147 Vt. 247, 252, 515 A.2d 123, 126 (1986). "That a different weight or conclusion could be drawn from the same evidence may by grist for disagreement, but does not show an abuse of discretion." Knutsen v. Cegalis, 2011 VT 128, ¶ 13, 191 Vt. 546, 35 A.3d 1059 (mem.).

¶ 28. The family division made numerous findings regarding the nature of the parties' relationship, and concluded, based on several factual findings, that plaintiff failed to demonstrate that she held out J.F. as her own child. Plaintiff points to some evidence demonstrating that she did hold J.F. out as her own child—namely, mother's two Facebook posts referring to plaintiff as a parental figure. However, the family division acted well within its discretion in not assigning significant weight to this evidence because the Facebook posts represented "two statements over the course of four years" and in "practice, neither [mother] nor [plaintiff] held [plaintiff] out as a parent of [J.F.]." In short, the family division's conclusion that plaintiff failed to demonstrate factor D by clear and convincing evidence is amply supported by the factual findings, which are in turn not clearly erroneous.

### III. Factor E

¶ 29. Factor E requires a person seeking de facto parentage to demonstrate he/she "established a bonded and dependent relationship with the child that is parental in nature." 15C V.S.A. § 501(a)(1)(E). The family division concluded that although plaintiff demonstrated she had a bonded relationship with J.F., she had not demonstrated the relationship was parental in nature because, citing the discussion regarding factor C, plaintiff's relationship was more of a nanny than that of a parent. Plaintiff argues that her relationship with J.F. was parental in nature because she purchased J.F.'s clothes and attended medical and school-related appointments. In

10

addition, plaintiff argues that mother acknowledged during her testimony that she never stopped plaintiff from caring for J.F.

¶ 30. As discussed above, the family division's conclusion that plaintiff acted more like a nanny than a parent is adequately supported by its factual findings, which included that plaintiff only watched J.F. on a set schedule while mother was at work. Although plaintiff points to evidence in the record that she argues demonstrates she acted like a parent, "it [is] the province of the trial court to determine the credibility of the witnesses and weigh the persuasiveness of the evidence." Cabot, 166 Vt. at 497, 697 A.2d at 652.

IV. Factor G

¶ 31. Finally, the family division concluded that plaintiff did not prove by clear and convincing evidence that continuing her relationship with J.F. was in his best interest. Even assuming that plaintiff's relationship with the child was parental in nature, the family division concluded that "continuing a 'parental' relationship" was not in J.F.'s best interests.

¶ 32. As an initial matter, the family division unduly restricted factor G to a consideration of whether continuing a parental relationship between the person and the child is in the child's best interests. "In construing a statute, the court's primary objective is to effectuate the Legislature's intent." T.C. v. L.D., 2020 VT 19, ¶ 4, __ Vt. ___, 229 A.3d 77 (quotation and alteration omitted). "Where the Legislature's intent can be ascertained from the plain meaning of the statute, we interpret the statute according to the words the Legislature used." In re M.C., 2018 VT 139, ¶ 9, 209 Vt. 219, 204 A.3d 1123 (quotation omitted).

¶ 33. Factor G provides that a person seeking de facto parentage must prove that "continuing the relationship between the person and the child is in the best interests of the child." 15C V.S.A. § 501(a)(1)(G). By its plain text, factor G is not limited to a consideration of whether continuing a "parental" relationship is in a child's best interest; rather, it requires a broader consideration of the relationship between the person seeking de facto parentage and the child. This understanding is confirmed by 15C V.S.A. § 501(a)(1) as a whole because several other factors in

11

§ 501(a)(1) specifically address the "parental" aspect of the relationship between a person seeking de facto parentage and the child, and factor G considers only "the relationship." See Shires Hous., Inc. v. Brown, 2017 VT 60, ¶ 9, 205 Vt. 186, 172 A.3d 1215 ("If a statute is clear on its face, we accept its plain meaning . . . .").

¶ 34.    Notwithstanding that the family division's interpretation of factor G was too narrow, it made specific findings and conclusions regarding the broader relationship between J.F. and plaintiff. It concluded that continuing the relationship was not in J.F.'s best interests because it found that the controlling nature of father's and plaintiff's relationship with mother had a negative impact on the child that caused J.F to experience difficulty sleeping, constipation, and bedwetting. Furthermore, plaintiff's report to mother's employer resulted in mother being suspended from her job. Therefore, the family division found that continuing plaintiff's relationship with J.F. would result in continuing control over mother. These findings are sufficient to support a conclusion that continuing plaintiff's relationship with J.F. was not in the child's best interests.

¶ 35.    Moving to plaintiff's specific grounds for error, she argues the family division should not have credited mother's testimony regarding the controlling nature of the parties' relationship given that, according to plaintiff, mother is, among other things, an inattentive and irresponsible parent. Further, plaintiff argues there is no evidence that the stress of the relationship caused J.F.'s behaviors.

¶ 36.    First, the family division did not err in crediting mother's testimony about the controlling nature of the parties' relationship. It is within the family division's "sound discretion" to weigh the credibility of witnesses, In re A.F., 160 Vt. at 178, 624 A.2d at 869, and we will not "reappraise the sincerity, motivations and consistency of witnesses," Cegalis, 2011 VT 128, ¶ 13.

¶ 37.    Second, the family division's findings regarding the negative effect the antagonistic relationship between plaintiff and mother had on J.F. are not clearly erroneous. "A determination by the trier of fact must stand if supported by credible evidence, even if inconsistencies or contrary

12

evidence exists." <u>Zeller</u>, 147 Vt. at 252, 515 A.2d at 126. Reasonable inferences may also be drawn from the evidence presented. <u>Lyddy v. Lyddy</u>, 173 Vt. 493, 496, 787 A.2d 506, 512 (2001) (mem.). The family division found that prior to the separation, J.F. had difficulty sleeping, wet the bed, struggled with constipation, and had a nervous tick where he pulled at his lip. After the separation, however, the family division found that these behaviors either improved or stopped. It was reasonable to infer from these findings that J.F.'s behaviors improved because the stress in his home de-escalated.

¶ 38.    In sum, the family division's conclusion that plaintiff failed to demonstrate factors C, D, E, and G by clear and convincing evidence is supported by its findings, which in turn are supported by the evidence.

<u>Affirmed</u>.

FOR THE COURT:

_____

Associate Justice

13