NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2020 VT 100

No. 2020-060

| | |
|---|---|
| Ashton Peralta | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, |
| | Family Division |
| | |
| Ashlie Brannan | September Term, 2020 |

Thomas Carlson, J.

Ashton Peralta, Pro Se, Burlington, Plaintiff-Appellee.

Samantha V. Lednicky of Murdoch Hughes Twarog Tarnelli, Burlington, for
 Defendant-Appellant.


PRESENT: Reiber, C.J., Robinson, Eaton, Carroll and Cohen, JJ.


¶ 1.     **REIBER, C.J.**   Mother appeals from the trial court's determination that Ashton Peralta is a de facto parent of A.Z. pursuant to 15C V.S.A. § 501. She argues that the court erred both in denying her motion to dismiss and in evaluating the factors set forth in § 501(a). We affirm.

¶ 2.     In June 2019, following a long-term relationship with mother, Mr. Peralta filed a petition to be declared a de facto parent of A.Z., born in June 2010. Mother and Mr. Peralta are also the biological parents of S.P., born in January 2016.

¶ 3.     Mother moved to dismiss Mr. Peralta's petition. She argued that A.Z.'s parentage was determined by a New Mexico court in a 2012 parentage action and Vermont must give this

decision full faith and credit. The court denied mother's motion. It explained that the New Mexico order addressed biological parentage, not de facto parentage, and under Vermont law, a child can have a de facto parent and two biological parents. It found nothing in the New Mexico order to preclude that possibility here.

¶ 4. Following a merits hearing, the court recognized Mr. Peralta as A.Z.'s de facto parent. It made the following findings. A.Z.'s biological father has played no role in her life; he did not appear in this case or answer Mr. Peralta's petition. He last appeared by telephone in the January 2012 parentage action in New Mexico. At that time, a New Mexico court ordered that he have no contact with A.Z. until he took certain steps related to his history of domestic violence. A.Z.'s biological father had not been heard from since.

¶ 5. Mr. Peralta and mother met online. In late 2011, Mr. Peralta relocated from Georgia to New Mexico to move in with mother and A.Z. They all moved to Connecticut about six months later to live with Mr. Peralta's parents. In 2016, mother and Mr. Peralta had a child, S.P. Not long thereafter, the parties moved to Vermont with Mr. Peralta's parents. With the exception of one year in which they had their own apartment, the parties lived with Mr. Peralta's parents between May 2012 and December 2017, when Mr. Peralta moved out. Mother and the children stayed with Mr. Peralta's parents until September 2018. The court found that Mr. Peralta's parents had been hosts, financial supporters, grandparents, and back-up caregivers to A.Z. since 2012 and S.P. since her birth.

¶ 6. As between mother and Mr. Peralta, the court found that mother was A.Z.'s primary caregiver. Mr. Peralta co-parented A.Z. before and after work and, as of 2015, he and A.Z. shared "Daddy's Day" on Saturdays. Mr. Peralta attended medical and dental appointments for A.Z. between 2011 and at least mid-2016. The parties took family trips and otherwise acted as an intact family. The court found this reflected in family photographs between 2012-2016. It further found

2

that photographs of Mr. Peralta and A.Z. between 2017-2019 reflected his ongoing role as a father to A.Z. and the ongoing role of his family members in A.Z.'s life.

¶ 7. In mid-2016, Mr. Peralta began to abuse depressant medication known as "benzos." By late 2016, he was regularly "dopey," paranoid, and grumpy. Mother and Mr. Peralta's relationship suffered. They frequently argued but there was little or no evidence of physical abuse. During this time, Mr. Peralta was not a present parent. In early 2017, while Mr. Peralta was still living in the home, he appeared to overdose while the children were sleeping. He spent a week in detox at the University of Vermont Medical Center in January 2017, and another week in February 2017. His verbal behavior became increasingly threatening.

¶ 8. In late 2017, mother believed that Mr. Peralta tried to poison her in one of his paranoid periods. He was charged with crimes that were later dismissed and expunged. He agreed to a relief-from-abuse (RFA) order without findings, which was later extended until the spring of 2019. Mother agreed to terminate the RFA order in connection with an agreement in S.P.'s parentage case.

¶ 9. As indicated above, Mr. Peralta moved out of the home in December 2017; mother and the children stayed with Mr. Peralta's parents until they had a falling-out in September 2018. Mr. Peralta's parents watched the children and helped mother get her driver's license. They also supervised Mr. Peralta's visitation.

¶ 10. At the time of the hearing, Mr. Peralta had been drug-free for about eighteen months. He had stopped using drugs in late 2017 but relapsed in the spring of 2018. He then engaged in an intensive outpatient program, graduating in July 2018, and he had been sober since. Mr. Peralta had been seeing the same counselor since January 2019, and he had been working full-time since February 2019. He lived with his parents and planned to remain in counseling for both substance abuse and anxiety.

¶ 11.  Mr. Peralta had been seeing A.Z. at his parents' home on a set schedule since November 2017; he had also been seeing S.P. on a regular schedule since March 2019.  A.Z. had always and continued to recognize Mr. Peralta as her "daddy."

¶ 12.  The court found that A.Z. was nine-and-a-half years old and Mr. Peralta was the only father figure she had ever known, although Mr. Peralta's father also played a very important role in her life.  She was outgoing, bright, and doing well in school.  She had many friends and was close to her sister, S.P.  She was also very close to Mr. Peralta's parents and to his parents' twelve-year-old adopted daughter.

¶ 13.  Based on these and other findings, the court evaluated the factors set forth in 15C V.S.A. § 501(a).  Pursuant to that section, "the court shall adjudicate the person who claims to be a de facto parent to be a parent of the child if the person demonstrates by clear and convincing evidence that:

> (A) the person resided with the child as a regular member of the child's household for a significant period of time;
>
> (B) the person engaged in consistent caretaking of the child;
>
> (C) the person undertook full and permanent responsibilities of a parent of the child without expectation of financial compensation;
>
> (D) the person held out the child as the person's child;
>
> (E) the person established a bonded and dependent relationship with the child that is parental in nature;
>
> (F) the person and another parent of the child fostered or supported the bonded and dependent relationship required under subdivision (E) of this subdivision (1); and
>
> (G) continuing the relationship between the person and the child is in the best interests of the child.

Id. § 501(a)(1)(A)-(G).

¶ 14.  The court concluded that Mr. Peralta satisfied his burden of proof as to each factor. It found the first six factors satisfied during the first four-to-five years of Mr. Peralta's relationship

4

with mother and A.Z. It further held that, notwithstanding Mr. Peralta's mental-health and substance-abuse challenges, the evidence established that continuing the parental relationship between A.Z. and Mr. Peralta was in A.Z.'s best interests. Looking to the best-interest criteria in 15 V.S.A. § 665 for guidance, the court found most compelling A.Z.'s happy and outgoing disposition. She had been raised thus far by a blended family with Mr. Peralta as her father and the court found her disposition to be the best evidence that her rearing had been a success.

¶ 15. The court did not consider Mr. Peralta's period of substance abuse disqualifying. It had no doubt that Mr. Peralta had the "ability and disposition to provide [A.Z.] with love, guidance, and material support, particularly if he is sober and taking care of his mental-health needs."

¶ 16. The court further concluded that A.Z. was thoroughly adjusted to her long-established and nourishing relationships with Mr. Peralta and his family, relationships that would have no assurance of continuing if it did not adjudicate Mr. Peralta a de facto parent. The court determined that discontinuing these relationships would likely be devastating to A.Z., and it noted that she had struggled to make sense of how Mr. Peralta could be S.P.'s father but not hers. While there was evidence that Mr. Peralta could be controlling in his relationship with mother, the court found little to no evidence of physical abuse between them and none as to A.Z. Although it could imagine mother being afraid of Mr. Peralta in the past, particularly when he was abusing drugs and getting paranoid, the court did not find any other basis for fear. As long as Mr. Peralta was sober and taking care of his mental health, the court found that he was a positive force in A.Z.'s life and he was not a threat to mother.

¶ 17. The court thus found that Mr. Peralta was A.Z.'s de facto parent, while mother retained sole legal and physical rights and responsibilities for her. The court consolidated this case with S.P.'s parentage case and concluded that it was in A.Z.'s best interests to have the same contact schedule with Mr. Peralta as did S.P., at least to start. The court explained that the sisters

5

were very close and there was no distinguishing fact between them with respect to their time with Mr. Peralta. Mother appeals from the court's decision.

¶ 18. Mother first challenges the court's denial of her motion to dismiss, a question we review de novo. See Bock v. Gold, 2008 VT 81, ¶ 4, 184 Vt. 575, 959 A.2d 990 (mem.) ("We review the trial court's disposition of a motion to dismiss de novo, and may affirm on any appropriate ground."). According to mother, A.Z.'s parentage was established by the 2012 New Mexico parentage order and the trial court was obligated to give this decision full faith and credit. She does not elaborate on this argument. Mother also asserts, apparently for the first time on appeal, that Mr. Peralta's petition should have been dismissed as untimely because it was filed "years" after he and mother separated.

¶ 19. We find no error. As the trial court recognized, there is nothing in the Vermont de facto parentage law that undermines the New Mexico decision or is inconsistent with giving that decision full faith and credit. See 15C V.S.A. § 116 ("A court of this State shall give full faith and credit to a determination of parentage and to an acknowledgment of parentage from another state if the determination is valid and effective in accordance with the law of the other state."); 15 V.S.A. § 1092(a) ("A Vermont court shall accord full faith and credit to an order issued by another state and consistent with this chapter which enforces a child custody determination by a court of another state unless the order has been vacated, stayed, or modified by a court having jurisdiction to do so under subchapter 2 of this chapter."); see also U.S. Const. art. IV, § 1 ("Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State."). A child can have two biological parents and a de facto parent, and under Vermont law, "[t]he adjudication of a person as a de facto parent . . . does not disestablish the parentage of any other parent." 15C V.S.A. § 501(c). Mother's primary argument thus fails. Assuming arguendo that mother's timeliness argument was preserved, we reject it. The statute imposes no requirement on

6

when a de facto parentage petition must be filed and mother cites no legal authority for imposing such a requirement. The motion to dismiss was properly denied.

¶ 20. We thus turn to the court's evaluation of the factors set forth in § 501(a)(1).[*] Mother challenges each factor, essentially arguing that the court did not properly weigh the evidence.

¶ 21. On review, we will uphold the trial court's findings unless they are clearly erroneous, meaning that there is no credible evidence to support them. See Lanfear v. Ruggerio, 2020 VT 84, ¶ 16, __ Vt. __, __ A.3d __. "We will affirm a trial court's legal conclusions if reasonably supported by the findings." Id. (quotation omitted). We emphasize that it is the exclusive role of the trial court to assess the credibility of witnesses and weigh the evidence; we do not reweigh the evidence on appeal. See id.

¶ 22. Mother first asserts that the court erred in concluding that Mr. Peralta "resided with [A.Z.] as a regular member of [her] household for a significant period of time." See 15C V.S.A. § 501(a)(1)(A). She contends that the court needed to exclude the time in which Mr. Peralta struggled with addiction and argues that he therefore effectively parented A.Z. for only four years. Mother argues this is an insignificant amount of time in the life of a nine-year-old. She cites In re Child of Philip S., 2020 ME 2, 223 A.3d 114, in support of her position.

¶ 23. We find no error. While mother argues that the time period was insignificant, the court acted within its discretion in concluding otherwise. The court found that Mr. Peralta lived with A.Z. as a household member between late 2011, when A.Z. was one year old, until December

---

[*] We note that 15C V.S.A. § 501(b) states that "if there is more than one other person who is a parent or has a claim to parentage of the child and the court determines that the requirements of subsection (a) of this section are met by clear and convincing evidence, the court shall adjudicate parentage under section 206 of this title, subject to other applicable limitations in this title." We do not address the operation of § 206 here because no party raises this issue, A.Z.'s biological father has been absent since 2012, and her biological father did not respond to Mr. Peralta's petition or appear in this case.

2017, when she was seven. We need not address mother's argument about excluding the time during which Mr. Peralta struggled with drug addiction because the court found this factor satisfied during the first four-to-five years that Mr. Peralta lived with mother and A.Z. prior to when he began struggling with drug addiction. It is reasonable to find this length of time significant. While mother urges us to draw a different conclusion from the evidence, we do not reweigh the evidence on appeal. "That a different weight or conclusion could be drawn from the same evidence may by grist for disagreement, but does not show an abuse of discretion." Knutsen v. Cegalis, 2011 VT 128, ¶ 13, 191 Vt. 546, 35 A.3d 1059; see also Meyncke v. Meyncke, 2009 VT 84, ¶ 15, 186 Vt. 571, 980 A.2d 799 (explaining that arguments which amount to nothing more than disagreement with court's reasoning and conclusion do not make out case for abuse of discretion). Mother fails to show any abuse of discretion here.

¶ 24. This case is not like In re Child of Philip S., 2020 ME 2, which mother cites. In that case, a child, who was the subject of several child-protection proceedings, lived with his paternal aunt and uncle for twenty-two months. The child's father was present for all but seven of these months. The relatives "wanted to assist the father with his [substance-abuse] recovery and help him become independent." Id. ¶ 4. The court found that "[t]he father accepted their help, but he was resentful of what he perceived as an intrusion on his parenting of the child." Id. ¶ 5. During this time, the father also relied on the child's former foster parent for overnight care.

¶ 25. When a second child-protection case was opened, the child was placed with the aunt and uncle as a kinship placement "on the condition that the father not return to the household." Id. ¶ 7. The aunt and uncle cared for the child in this capacity for seven months until they left the child unsupervised with his father. They were removed as a kinship placement, and the child was returned to his prior foster home.

¶ 26. The aunt and uncle then sought to intervene in the child-protection matter, and they also sought to establish themselves as the child's de facto parents. Id. ¶ 8. The trial court

determined that the relatives failed to satisfy any of the de facto parentage factors, including that the child had resided with them for a significant time. Id. ¶ 11. The appeals court upheld this decision. It explained that during seven of the twenty-two months that the child and his father lived with these relatives, the relatives were serving "as a kinship placement during the child protection matter—a time when the goal was for the father to rehabilitate and reunify with the child—and . . . the father was able to be responsible for the child during the early months of shared residence." Id. ¶ 20. For these reasons, the court concluded that "the evidence d[id] not compel a finding that the duration of shared residence met the 'significant period of time' standard." Id. ¶ 20.

¶ 27. We are faced with much different circumstances here. In this case, Mr. Peralta lived with and parented A.Z. for at least four-to-five years, excluding for argument purposes the time in which he struggled with addiction. This is almost half of A.Z.'s life. He was the only father figure that A.Z. had known and she considered him her "daddy." The court reasonably concluded that the significant-time requirement was satisfied here.

¶ 28. Mother next challenges the court's conclusion that Mr. Peralta "engaged in consistent caretaking" of A.Z. as required by 15C V.S.A. § 501(a)(1)(B). According to mother, the court ignored the period in which Mr. Peralta did not provide any caretaking, and its findings were otherwise insufficient. She asserts that Mr. Peralta's financial contribution to the family should not be considered as caretaking.

¶ 29. Again, the court found this factor satisfied in the first four-to-five years of Mr. Peralta's cohabitation with mother and A.Z. and thus, we need not consider the time in which Mr. Peralta struggled with drug addiction. We emphasize, however, that the court did not ignore this period, as mother suggests. It expressly recognized that there was a period in which Mr. Peralta was not a present parent due to his drug use. But it found that this did not undermine the fact that, during the prior five years, he had provided daily support for A.Z., including a full day of care for

9

"Daddy's Day" on the weekends; he helped A.Z. get ready for school in the mornings and transported her to school; and he also attended A.Z.'s medical and dental appointments. Mr. Peralta testified to his caretaking role, including those activities just cited as well as taking A.Z. to playdates, chaperoning school trips, and being engaged with A.Z.'s extracurricular activities and with her friends. Even assuming arguendo that Mr. Peralta's financial contributions are not encompassed within caretaking, the court did not rely on these contributions in reaching its conclusion as to this factor. The court's findings support its conclusion that Mr. Peralta engaged in consistent caretaking.

¶ 30.  We are unpersuaded by mother's citation of her own testimony characterizing Mr. Peralta's contribution as "minimal" and other evidence which she believes support a contrary conclusion. "A determination by the trier of fact must stand if supported by credible evidence, even if inconsistencies or contrary evidence exists." Lanfear, 2020 VT 84, ¶ 27 (quotation omitted). We reiterate that "[i]t is within the [trial court's] sound discretion to weigh the credibility of witnesses, and we will not reappraise the sincerity, motivations and consistency of witnesses." Id. ¶ 36 (quotations and citation omitted). The court credited Mr. Peralta's testimony regarding his caretaking role, and we do not revisit its credibility assessments on appeal.

¶ 31.  Mother again cites In re Child of Philip S., 2020 ME 2, to support her argument as to this second factor. We are unpersuaded. Unlike in In re Child of Philip S., the court here did not find that Mr. Peralta was one of many people trying to help mother become independent by providing care for A.Z., nor did it find that mother was "the parental decisionmaker and caretaker" during the time the parties lived together. Cf. In re Child of Philip S., 2020 ME 2, ¶ 21 (upholding trial court's conclusion that relatives did not engage in consistent caretaking of child where child's "father was—even in the uncle's and aunt's minds—the parental decisionmaker and caretaker" while father lived in home, and "many people—including the child's former foster mother and other paternal family members—were caring for the child to help the father"). While mother urges

us to evaluate the evidence differently than did the trial court, that is not our role. We find no abuse of discretion.

¶ 32. We next consider mother's assertion that the court erred in concluding that Mr. Peralta "undertook full and permanent responsibilities of a parent of the child without expectation of financial compensation." 15C V.S.A. § 501(a)(1)(C). Mother asserts that the court relied on Mr. Peralta's parents' conduct in reaching its conclusion about Mr. Peralta. She argues that his parents financially supported the parties and cared for A.Z., not Mr. Peralta.

¶ 33. The record does not support this contention. While the court recognized the important role of Mr. Peralta's parents, it did not credit their contributions to Mr. Peralta, nor did the court conclude that Mr. Peralta merely "resided in the same household" with A.Z., as mother suggests. It found that Mr. Peralta undertook parental responsibilities as set forth above, findings that are supported by the record and that support the court's conclusion. To the extent that mother considers Mr. Peralta's financial contributions relevant under this factor, Mr. Peralta testified that he worked full-time during the relationship while mother only occasionally worked part-time; the court recounted Mr. Peralta's job history in its decision. Mr. Peralta also testified that he purchased food and clothing for A.Z. and paid for family trips and other activities that the family engaged in. The fact that the parties lived with Mr. Peralta's parents does not negate these contributions or undermine the court's conclusion as to this factor. The court concluded that Mr. Peralta satisfied this factor during the first four-to-five years that he lived with mother and A.Z. before he began to struggle with addiction. Again, while mother would characterize the evidence differently, we defer to the trial court's assessment of the evidence.

¶ 34. Mother next challenges the court's conclusion that Mr. Peralta "held out [A.Z.] as [his] child." 15C V.S.A. § 501(a)(1)(D). She contends that the court could not attach any significance to the fact that the child referred to Mr. Peralta as "Daddy." Mother also argues that children do not necessarily struggle with the idea that their siblings have a different parent and

11

thus, the court could not reasonably find that A.Z. "struggled with how to make sense of Mr. Peralta being [S.P.]'s father but not hers."

¶ 35. Again, the significance of A.Z. calling Mr. Peralta "Daddy" or the use of the term "Daddy's Day" on the weekends was for the court to evaluate. In addition to the use of these terms, the court found that Mr. Peralta was the only father figure that A.Z. had known, a finding supported by the record. The court also cited photographs depicting an intact family between 2012 and 2016 and depicting a familial relationship after that date as well. It was reasonable for the court to infer, moreover, that it would be hard for A.Z. to understand, given the circumstances of this case, why Mr. Peralta—whom she had lived with as a parent figure for much of her life—was a father to her younger sister but not her. See Lanfear, 2020 VT 84, ¶ 37 (recognizing that court may draw "[r]easonable inferences . . . from the evidence presented"). Indeed, Mr. Peralta testified that differences in the amount of time he saw the girls was upsetting to A.Z.

¶ 36. Mother's remaining challenges similarly attack the court's assessment of the evidence. As to the court's conclusion that Mr. Peralta "established a bonded and dependent relationship with [A.Z.] that is parental in nature," mother argues that his role in the child's life was limited, was not a parental relationship, and any bond developed after mother and Mr. Peralta ended their relationship. Again, the court concluded otherwise, and its decision is supported by its findings, which in turn are supported by the evidence.

¶ 37. Mother next argues that the court erred in concluding that she and Mr. Peralta "fostered or supported the bonded and dependent relationship required under subdivision (E)" above. She asserts that there was no bonded relationship between Mr. Peralta and A.Z. and at most, there was no evidence of a bond until 2019. Even if a bond did exist earlier, mother contends that she did not allow it to occur voluntarily and the court failed to consider "evidence of duress, coercion, or threat of harm" under 15C V.S.A. § 501(a)(2).

12

¶ 38. The court concluded that this statutory factor was satisfied, and its conclusion is supported by its findings. As previously discussed, the court found that Mr. Peralta acted as a co-parent, including on Saturdays when he and A.Z. shared "Daddy's Day." He attended medical and dental appointments; the parties took family trips and otherwise acted as an intact family. Mr. Peralta was the only father figure A.Z. had ever known, and she was thoroughly adjusted to a long-established and nourishing relationship with Mr. Peralta. The court found that A.Z. was likely to be devastated if her relationship with Mr. Peralta was severed. The court plainly did not make findings about, or limit its analysis to, testimony about interactions in 2019, as mother suggests.

¶ 39. The court did not conclude that the bonded and dependent relationship between Mr. Peralta and A.Z. was caused by "duress, coercion, or threat of harm." See 15C V.S.A. § 501(a)(2). Mr. Peralta was never "subject to a final abuse-protection order" based on a finding that he "committed abuse against the child." See id. To the contrary, the court found no evidence of abuse of A.Z. nor that mother acted under duress. The court acknowledged that Mr. Peralta could be controlling in his relationship with mother, but it found little to no evidence of any abuse of mother. It recognized that mother might have feared Mr. Peralta's behavior during the time he was abusing substances, but it found no other basis for such fear. As long as he was sober and taking care of his mental health, which the court found he was, the court concluded that Mr. Peralta was a positive force in A.Z.'s life and no threat to mother.

¶ 40. Mother complains that the court "failed to consider" her testimony and the testimony of her witness, a police officer, which she argues established that mother allowed the relationship between Mr. Peralta and A.Z. to continue due to duress. The court did not fail to consider this evidence; it found the evidence unpersuasive. The court was not obligated to find that mother acted under duress as mother asserts. It was not required to credit the testimony of her witness. It could also credit some but not all of the testimony of this witness and the other witnesses at the hearing. It is solely the "province of the trial court to determine the credibility of

the witnesses and weigh the persuasiveness of the evidence," Lanfear, 2020 VT 84, ¶ 30 (quotation omitted), and mother fails to show any abuse of discretion.

¶ 41.    Finally, the court did not abuse its discretion in concluding that "continuing the relationship between [Mr. Peralta] and [A.Z.] is in the best interests of the child."  15C V.S.A. § 501(a)(1)(G).  Mother argues that the overwhelming evidence, including Mr. Peralta's behavior during his drug addiction, showed that this factor was not satisfied.  She states that she has the ability to maintain A.Z.'s positive relationships with Mr. Peralta's sister and his parents and it is not enough that there may be some benefit to continuing Mr. Peralta's relationship with A.Z.  Mother also suggests that in its consideration of this factor, the court erroneously assumed that Mr. Peralta was already established as a parent and it viewed his drug use through the lens of whether his parental rights should be terminated.  She contends that the court failed to address whether Mr. Peralta was a good parent and was currently managing his sobriety and mental health.  Mother cites her own testimony in support of her position.

¶ 42.    The court applied the appropriate best-interest standard in reaching its conclusion; it did not treat this as a termination case.  As we recently explained, this factor "is not limited to a consideration of whether continuing a 'parental' relationship is in a child's best interest; rather, it requires a broader consideration of the relationship between the person seeking de facto parentage and the child."  Lanfear, 2020 VT 84, ¶ 33.  The court's findings support its conclusion that continuing Mr. Peralta's relationship with A.Z. was in A.Z.'s best interests

¶ 43.    Again, mother simply challenges the court's evaluation of the weight of the evidence.  The fact that mother considers the evidence "overwhelming" in no way obligated the court to so conclude.  The court did not ignore Mr. Peralta's drug addiction and recovery.  It addressed his behavior and found that, following an intensive outpatient program, he had been sober for eighteen months.  It described the ways in which Mr. Peralta was addressing his mental health and maintaining sobriety.  It found Mr. Peralta to be a positive force in A.Z.'s life and

determined that she was thoroughly adjusted to this long-established and nourishing relationship. It reasonably concluded, based on its findings, that continuing this relationship was in A.Z.'s best interests.  We find no error in the court's determination that Mr. Peralta is A.Z.'s de facto parent.

Affirmed.

FOR THE COURT:

_____
Chief Justice

15