VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org



Case No.     25-AP-321

*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

MAY TERM,   2026

Mary Zigman\* v. Sarah Goodwin

     }   APPEALED FROM:
     }   Superior Court, Rutland Unit,
     }   Family Division
     }   CASE NO. 24-DM-01181
         Trial Judge: John W. Valente

In the above-entitled cause, the Clerk will enter:

Petitioner Mary Zigman appeals from a family division order denying her petition to be adjudicated a de facto parent of C.G., the minor son of respondent Sarah Goodwin.[1]  We affirm.

## I.  Procedural Background

The record reflects the following.  In May 2024, Ms. Zigman and Chris Scotellaro filed separate petitions seeking to be adjudicated as de facto parents of C.G. pursuant to 15C V.S.A. §§ 501-502.  Through counsel, Ms. Zigman moved to consolidate the two proceedings on grounds that each involved interrelated factual and legal issues.  The court granted the motion.  It held an evidentiary hearing on the consolidated petitions over three days in July, September, and November 2024.[2]  Petitioners were represented by the same attorney and respondent was self-represented.  In December 2024, the court issued a written decision including the following factual findings.

C.G. was born in May 2019.  Respondent became a client at the Rutland County Parent Child Center, where she took a parenting class and received assistance with C.G.'s upbringing.

---

[1]  Respondent did not participate in this appeal.

[2]  Respondent did not appear for the final day of the hearing in November 2024.

Petitioners both worked at the Rutland County Parent Child Center and were in a romantic relationship between 2019 and 2023. Petitioners' relationship with respondent and C.G. began while they were providing respondent with social services as part of their work at the Center.

Ms. Zigman was the Center's executive director and, in that role, posted her phone number in the facility for clients' use. In late 2019, respondent called Ms. Zigman using this number; at the time, the Center was closed, and respondent was in crisis due to substance use. Respondent explained that she needed someone to watch C.G. while she received emergency medical treatment, and Ms. Zigman agreed to take C.G. for the night.

Petitioners subsequently began taking care of C.G. on a fairly regular basis to allow respondent to work and receive respite. They provided respondent with significant support during her struggles with substance abuse. When respondent was in crisis due to substance use, domestic violence, or interactions with law enforcement, she would reach out to Ms. Zigman for assistance with C.G.'s care.

In May 2020, respondent executed a document purporting to give petitioners temporary guardianship of C.G. for a six-day period. Shortly thereafter, the parties held a gathering for C.G.'s first birthday where they celebrated themselves as "a non-traditional family." The parties and C.G. then began spending a significant amount of time together.

Respondent considered petitioners to be her family. She gave Mr. Scotellaro a shirt that read, "Best Dad Ever," and described Ms. Zigman as being like a mother to her. Respondent looked to Ms. Zigman for guidance, and Ms. Zigman provided it.

By the end of 2020, petitioners were concerned that respondent and C.G. were at risk due to respondent's ongoing struggles. While both petitioners were mandated reporters, neither made a report at that time. They attempted to support and assist respondent themselves.

In 2022, respondent signed a document titled "consent to treat." The document provided that petitioners could make medical decisions for C.G. in the event of an emergency and stated that it was valid until respondent was "medically able to care for [C.G.] and return home." It also specified that petitioners were not authorized to allow C.G. to receive certain vaccinations.

Petitioners always followed respondent's directions and criteria in caring for C.G., including her directions as to his medical care. They loved C.G. and had a bonded, dependent relationship with him. They spent time with C.G. for holidays and other gatherings. They routinely had him stay for "extra" nights. They provided a room for him in their home with appropriate toys, purchased clothing for him, and attended his medical and school-related appointments.

Petitioners' romantic relationship ended in February 2023, but they remained friends.

Respondent's mental health vacillated over the years and, in spring 2024, she began to dysregulate. She stopped allowing petitioners to care for C.G. Petitioners perceived this as a "weaponization" of C.G. and, in April 2024, they reported their concerns for his safety to the

2

Department for Children and Families (DCF).  The following month, they filed their petitions for de facto parentage.

After the second evidentiary hearing but before the third and final hearing in November 2024, the court issued an interim order providing for temporary contact between petitioners and C.G.  Three visits occurred pursuant to the order and were very successful.  When petitioners arrived at respondent's home for their fourth visit, her car was not present and her apartment door appeared to be open.  Petitioners called law enforcement for a wellness check.  Law enforcement entered the apartment and found it to be in disarray, giving the appearance that respondent left with C.G. in a hurry.  Respondent voluntarily called law enforcement and reported that she was fleeing a "domestic situation" and that she and C.G. were safe.

Based on these and other findings, the court weighed the seven factors set forth in the de facto parentage statute.  As the court explained in its order, a person seeking to be adjudicated a de facto parent must demonstrate, by clear and convincing evidence, that:

> (A) the person resided with the child as a regular member of the child's household for a significant period of time;
>
> (B) the person engaged in consistent caretaking of the child;
>
> (C) the person undertook full and permanent responsibilities of a parent of the child without expectation of financial compensation;
>
> (D) the person held out the child as the person's child;
>
> (E) the person established a bonded and dependent relationship with the child that is parental in nature;
>
> (F) the person and another parent of the child fostered or supported the bonded and dependent relationship required under subdivision (E) of this subdivision (1); and
>
> (G) continuing the relationship between the person and the child is in the best interests of the child.

15C V.S.A. § 501(a)(1).  The trial court concluded that both petitioners met that burden with respect to factors (A), (B), (D), (E), and (F).  It found, however, that petitioners failed to satisfy factors (C) and (G).

With respect to factor (C), the court explained that petitioners failed to demonstrate that they undertook "full and permanent responsibilities of a parent of the child" because the documents respondent executed giving them permission to care for C.G. were conditional and time-limited; petitioners always engaged with C.G. with respondent's permission and did so in a way that was consistent with her instructions for his care; and petitioners provided care for C.G. in order to help stabilize respondent.

3

As to factor (G), the court concluded that continuation of the relationship between petitioners and C.G. was not in C.G.'s best interests. It explained that petitioners were in a position of authority over respondent by virtue of their roles at the Center, there was no evidence that the boundaries of the parties' relationship were ever defined, and petitioners' control negatively impacted the relationship. It also noted that although petitioners were mandated reporters, they did not report their concerns for C.G.'s safety as required until respondent foreclosed their contact with C.G. The court found that this reflected negatively on petitioners' ability and disposition to ensure that C.G.'s needs were met and his environment was safe.

For these reasons, the court denied both petitions. Petitioners' attorney subsequently withdrew. A new attorney entered an appearance on behalf of Ms. Zigman and filed a motion for a new trial on factors (C) and (G), alleging that Ms. Zigman's original attorney provided ineffective assistance in failing to seek out or present all relevant evidence. The court granted the motion, specifying that the evidence was to be reopened "on elements C and G." At Ms. Zigman's request, it scheduled the matter for a full-day hearing. It clarified, however, that "this is not a retrial of the case," and it was exercising its discretion to control its docket by not reopening the evidence as to the other § 501(a)(1) factors.

In May 2025, court then issued an order indicating that after reviewing both consolidated dockets, it noted that Mr. Scotarello had filed a pro se motion to reconsider that remained pending. The court explained that it was also granting Mr. Scotarello's motion. It provided that each of the three parties would be allotted one-third of the full-day hearing to present their evidence and cross-examine the witnesses.

Respondent did not appear at the June 2025 hearing. The court observed that respondent had not notified the court or petitioners of any new address after relocating from her prior residence and concluded that the notices that had been sent to respondent by email were sufficient service under the unique circumstances of the case.

In August 2025, the court issued its final order. It adopted and incorporated by reference the factual findings and legal conclusions set forth in the December 2024 order. The court then made additional findings of fact based on the evidence presented at the June 2025 hearing, and, on these bases, revisited its earlier conclusions with respect to factors (C) and (G).

As to factor (C), the court again found that Ms. Zigman's ultimate goal in providing care for C.G. was to assist respondent. Even if Ms. Zigman's goal was to raise C.G., however, the court explained that such a finding would be irrelevant to whether petitioners had undertaken the "full and permanent responsibilities of a parent of the child." 15C V.S.A. § 501(a)(1)(C). The court concluded that neither petitioner proved this by clear and convincing evidence: their responsibilities for C.G. were "limited and conditional." This alone, it explained, required that the petition be denied.

The court nonetheless went on to revisit factor (G). It observed that the new evidence made this factor "a closer call." It found the following. Ms. Zigman did, at some point, attempt to establish boundaries in the parties' relationship. She also placed a call to DCF to discuss C.G.'s situation prior to the formal report petitioners made in spring 2024. Petitioners also provided expert testimony from a doctor that sudden disruption of a parental relationship is traumatic to a child. However, petitioners' expert had not evaluated C.G., and his opinions

4

were based only on the limited information available to him.  As a result, he could not speak to any effects experienced by C.G. following the termination of his relationship with petitioners.  Based on this evidence, the court concluded that petitioners still had not met their burden to demonstrate that it was in C.G.'s best interests to continue his relationship with them.

As a result, the court denied both petitions.  Ms. Zigman, now self-represented, appeals.

## II. Analysis

We address a threshold issue regarding the scope of our review before considering the arguments on appeal.  Several of the case citations in Ms. Zigman's brief do not appear to correspond to any existing case.  While she cites to and purports to quote from decisions she ascribes to this Court, the citations provided correspond to different, unrelated cases.[3]  As a result, the arguments supported solely by these citations are inadequately briefed.  V.R.A.P. 28(a)(4) (requiring that appellant's brief include "the issues presented, how they were preserved, and appellant's contentions and the reasons for them—with citations to the authorities, statutes, and parts of the record on which the appellant relies").  We therefore decline to address them.  Pcolar v. Casella Waste Syst. Inc., 2012 VT 58, ¶ 19, 192 Vt. 343 (explaining that self-represented litigants must satisfy minimum briefing standards of V.R.A.P. 28(a)(4) and declining to address inadequately briefed argument).

With this understanding, we turn first to Ms. Zigman's challenges to the procedural rulings related to the June 2025 hearing.  She argues that, for several reasons, she was deprived of the meaningful opportunity to be heard secured by the constitutional right to due process.  See Stone v. Irasburg, 2014 VT 43, ¶ 27, 196 Vt. 356 ("[T]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." (quotation omitted)).  Specifically, Ms. Zigman contends that the court erred in: (1) limiting the scope of the hearing to evidence relevant to 15C V.S.A. § 501(a)(1)(C) and (G), rather than evaluating all seven elements together; and (2) "unexpectedly" consolidating the matter with Mr. Scotarello's petition, such that she had

---

[3]    We remind Ms. Zigman that, by presenting a document to this Court, she is certifying that "to the best of [her] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the claims, defenses, and other legal contentions contained therein "are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law." V.R.C.P. 11(b)(2); see also V.R.A.P. 25(d)(2) ("By presenting a document to the Court—whether by signing, filing, submitting, or later advocating—an attorney or self-represented party is making the certification provided by V.R.C.P. 11(b) as to that paper.").  Although self-represented litigants "receive some leeway from the courts," they are nonetheless bound by our rules of procedure, "includ[ing] the obligations of Rule 11 and sanctions for noncompliance." Zorn v. Smith, 2011 VT 10, ¶ 22, 189 Vt. 219.  We warn that future conduct of this nature may result in sanctions.  See V.R.A.P. 25(d)(2).

to share the June 2025 hearing time and was unable to present all of the evidence she wished to offer.[4]  We conclude that neither argument is preserved for our review on appeal.

"In order to rely on an argument on appeal, an appellant must properly preserve it by presenting it to the trial court with specificity and clarity."  O'Rourke v. Lunde, 2014 VT 88, ¶ 21, 197 Vt. 360 (alteration in original) (quotation omitted) (declining to address arguments raised for first time on appeal).  It was Ms. Zigman, through counsel, who requested that the trial court reopen the evidence as to § 501(a)(1)(C) and (G) only.  The court granted her request, and she has not demonstrated that she objected to proceeding in this fashion at any point.  Similarly, it was Ms. Zigman, through counsel, who originally moved to consolidate the proceedings on her petition with the proceedings on Mr. Scotarello's petition.  Although the trial court acted on its own motion in expanding the scope of the June hearing to encompass Mr. Scotarello's request for reconsideration, Ms. Zigman has not demonstrated that she objected to proceeding in this manner.  We therefore do not address these arguments as unpreserved.

Next, Ms. Zigman argues that at the June 2025 hearing, the trial court erred in excluding her testimony about what a DCF worker told her, as well as an exhibit depicting messages with the same worker.  The court concluded that both the testimony and the exhibit were inadmissible as hearsay—"a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." V.R.E. 801(c); see also V.R.E. 802 ("Hearsay is not admissible except as provided by these rules or by other rules prescribed by the Supreme Court or by statute.").  Ms. Zigman's attorney, however, did not object to the court's efforts when it interrupted testimony recounting what another person told Ms. Zigman.  Similarly, when the court asked why the exhibit was not hearsay, Ms. Zigman's counsel withdrew the exhibit.  Because Ms. Zigman did not offer any explanation as to why the exhibit or proposed testimony was not hearsay, her challenge to the exclusion of this evidence is not preserved for our review on appeal. O'Rourke, 2014 VT 88, ¶ 21.

Finally, we take up Ms. Zigman's challenges to the court's August 2025 order denying her petition to be adjudicated as a de facto parent of C.G.  On appeal, we defer to the trial court's factual findings "because it is better situated to resolve any disagreements by taking into account the weight of the evidence, the credibility of witnesses, and the persuasive effect

---

[4]  Ms. Zigman also contends that respondent "fled the courthouse" in the midst of the June 2025 hearing, eliminating any opportunity for cross-examination and thus depriving Ms. Zigman of a fair hearing.  The record reflects, however, that respondent never appeared for the June 2025 hearing.  It is true that respondent began her direct testimony at the September 2024 hearing and, because she did not appear at the November 2024 hearing, did not finish presenting her evidence and was not available for cross-examination during the initial series of hearings.  To the extent this circumstance forms the basis for Ms. Zigman's argument, she has not pointed to any part of the record indicating that she objected to proceeding with either the November 2024 hearing or the June 2025 hearing in respondent's absence.  See In re Green Mountain Power Corp., 2012 VT 89, ¶ 22, 192 Vt. 429 (recognizing that it is appellant's "burden to show how an issue is preserved"); V.R.A.P. 28(a)(4)(A) (requiring that appellant's brief include indications of how each issue was preserved with citations to portions of record relied on).  We therefore decline to address this argument as inadequately briefed.  Pcolar, 2012 VT 58, 19.

6

of the testimony." Lanfear v. Ruggerio, 2020 VT 84, ¶ 16, 213 Vt. 322 (quotation omitted). We will not disturb the findings "unless they are clearly erroneous, meaning that there is no credible evidence to support them." Peralta v. Brannan, 2020 VT 100, ¶ 21, 213 Vt. 493. We will uphold the court's legal conclusions if they are, in turn, "reasonably supported by the findings." Id. (quotation omitted).

Ms. Zigman does not appear to challenge any specific factual findings of the court as clearly erroneous. Instead, she argues that the court erred in failing to make findings based on certain evidence regarding the breadth of her previous involvement in C.G.'s care, respondent's mental-health struggles, and the impact on C.G. of severing his relationship with Ms. Zigman. A trial court, however, "is not required to make a finding regarding every item of evidence presented" at a hearing, though "it should make findings on all material issues raised by the evidence." In re M.E., 2019 VT 90, ¶ 20, 211 Vt. 320. Ms. Zigman has not demonstrated that the court failed to make findings on "all material issues raised by the evidence" before it. Id. For example, although Ms. Zigman contends that the court exhibited "silent disregard" for the expert testimony offered at the June 2025 hearing, the court's decision reflects that it considered this testimony but gave it limited weight because the doctor did not meet with C.G. to assess how he was impacted by no longer having contact with petitioners.

Ms. Zigman essentially asks that we revisit the trial court's credibility determinations and reweigh the evidence. Assessing the credibility of witnesses and weighing the evidence "is the exclusive role of the trial court," and "we do not reweigh the evidence on appeal." Peralta, 2020 VT 100, ¶ 21; Lanfear, 2020 VT 84, ¶ 36 (explaining that we entrust credibility determinations to the "sound discretion" of the trial court, and, on appeal, "will not reappraise the sincerity, motivations[,] and consistency of witnesses" (quotations omitted)). "That a different weight or conclusion could be drawn from the same evidence may be grist for disagreement, but does not show an abuse of discretion." Lanfear, 2020 VT 84 ¶ 27 (quotation omitted). Ms. Zigman has not demonstrated any abuse of discretion here.

Ms. Zigman also contends that the trial court misconstrued 15C V.S.A. § 501(a)(1)(C) by imposing what she describes as a requirement of "unconditional parental responsibility." Factor (C) requires a person seeking to be adjudicated a de facto parent to demonstrate that they "undertook full and permanent responsibilities of a parent of the child without expectation of financial compensation." Id. § 501(a)(1)(C). As discussed above, the court concluded that Ms. Zigman failed to make this showing because her caretaking responsibilities were "limited and conditional." Ms. Zigman mischaracterizes the court's analysis in arguing that the trial court imposed a requirement beyond that set forth by the statute: rather, the language she challenges is a factual finding that reasonably supports the court's conclusion that the responsibilities Ms. Zigman undertook were not the "full and permanent responsibilities of a parent of the child." Id.; see also, e.g., Lanfear, 2020 VT 84, ¶¶ 20-23 (affirming court's conclusion that factor (C) was not satisfied because petitioner's "role in the family was more akin to that of a nanny than of a parent"). The court did not err in concluding that Ms. Zigman had not met her burden as to factor (C).

Finally, Ms. Zigman argues that the court erred in assessing factor (G) without considering evidence of respondent's "instability" or C.G.'s safety or psychological well-being. In support of this proposition, she cites to 33 V.S.A. § 5101. That statute, however, sets forth the legislative purpose underlying the entirely separate Juvenile Judicial

Proceedings Act.  It does not impose any requirements with respect to the De Facto Parentage Act.  Our decisions under the latter statute, however, have repeatedly explained that factor (G) "is not limited to a consideration of whether continuing a 'parental' relationship is in a child's best interest; rather, it requires a broader consideration of the relationship between the person seeking de facto parentage and the child."  Peralta, 2020 VT 100, ¶ 42 (quotation omitted).  That was precisely the analysis the court engaged in here.  Ms. Zigman has not demonstrated that the court erred in concluding that she did not meet her burden with respect to factor (G).

Because there was no error, we reject Ms. Zigman's argument that the cumulative effect of the alleged errors requires reversal.  We have addressed all arguments discernible in her brief and conclude that they are without merit.

Affirmed.

BY THE COURT:

_____
Harold E. Eaton, Jr., Associate Justice


_____
Christina E. Nolan, Associate Justice


_____
Michael P. Drescher, Associate Justice

8